1   Jeremy V. Richards (CA Bar No. 102300)
    Linda F. Cantor (CA Bar No. 153762)
2   Maxim B. Litvak (CA Bar No. 215852)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 11th Floor
    Los Angeles, California 90067-4100
4   Telephone: 310/277-6910
    Facsimile: 310/201-0760
5   jrichards@pszjlaw.com
    lcantor@pszjlaw.com
6   mlitvak@pszjlaw.com

7   [Proposed] Attorneys for the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

In re:

WOODSIDE GROUP, LLC, et al.,[1]

            Debtors.

Chapter 11
6:08-bk-20682-PC
(Jointly Administered)

**DEBTORS' OPPOSITION TO:**

**(A) MOTION OF THE AD HOC GROUP OF NOTEHOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR, ALTERNATIVELY, DIRECTING BOTH (I) THE APPOINTMENT OF AN EXAMINER FOR CERTAIN SPECIFIED PURPOSES AND (II) THE TERMINATION OF THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE AND CONFIRM A PLAN; AND**

**(B) MOTION TO TERMINATE OR REDUCE THE DEBTORS' EXCLUSIVITY PERIOD**

Date:    October 14, 2008
Time:    9:30 a.m.
Place:   Courtroom 304
         United States Bankruptcy Court
         3420 Twelfth Street
         Riverside, CA 92501
Judge:   Honorable Peter H. Carroll

☒    Affects ALL DEBTORS

---

[1] *See Notice Identifying Jointly Administered Debtors* setting forth all debtors and debtors in possession in these jointly administered cases and their respective tax identification numbers [Docket No. 32].

*(left margin, vertical)* PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Table of Contents**

Page

I.    INTRODUCTION ................................................................................................... 2

II.    STATEMENT OF FACTS ..................................................................................... 5

    A.    General Background .................................................................................... 5

    B.    Debt Structure ............................................................................................. 6

        1.    Institutional Debt .............................................................................. 6

        2.    Joint Venture Liability ..................................................................... 7

        3.    Bond Indemnity and Warranty Claims ........................................... 7

        4.    Ordinary Course Debt ...................................................................... 7

    C.    Loan Defaults and Negotiations ................................................................. 7

    D.    Bankruptcy Proceedings ............................................................................ 9

    E.    The Corporate Restructuring ...................................................................... 10

        1.    Description and Background ............................................................ 10

        2.    Effect of the Corporate Restructuring ............................................ 13

    F.    The Zions Transfers ................................................................................... 14

    G.    Adverse Consequences From Appointment of a Trustee .......................... 17

III. Argument ....................................................................................................................... 17

    A.    There is a Strong Presumption That Management Should Not be Displaced ..................... 18

    B.    The Corporate Restructuring and Zions Transfers Do Not Constitute Fraud, Dishonesty, Incompetence, or Gross Mismanagement ................................................................. 19

    C.    Appointment of a Trustee is Unwarranted Where the Alleged Prepetition Mismanagement or Misconduct is Unlikely to Recur in Chapter 11 ................................. 20

    D.    The Mere Existence of Conflicts of Interest or Acrimony Do Not Justify the Appointment of a Trustee ............................................................................................ 22

    E.    The Appointment of a Trustee is Unnecessary Since the Noteholder Group or Other Estate Representative Can Take All Appropriate Actions ............................................. 23

    F.    Appointment of a Trustee Would Result in no Discernible Benefit, and is far Outweighed by the Burden Upon the Estate .......................................................................... 24

    G.    There Is No Need For The Estate To Fund An Examiner ......................... 26

    H.    Exclusivity Should Not be Terminated ...................................................... 27

IV.    REQUEST TO COMPEL ATTENDANCE OF DECLARANTS ......................... 31

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

V. CONCLUSION ........................................................................................................................... 31

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# Table of Authorities

**Page**

## Cases

*Ad Hoc Committee of Bondholders v. Citicorp Venture Capital Ltd.*
*(In re Fairwood Corporation),*
2000 WL 264319, *14-15 (S.D.N.Y. 2000) ................................................. 20, 24

*Geriatrics Nursing Home, Inc. vs. First Fidelity Bank, NA (In re Geriatrics Nursing Home, Inc.),*
187 B.R. 128, 133 (D. N.J. 1995) ................................................. 28

*In re 4 C Solutions, Inc.,*
289 B.R. 354 (Bankr. C.D. Ill. 2003) ................................................. 18, 21

*In re Adelphia Communications Corp.,*
336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) ................................................. 18, 28

*In re Anchorage Boat Sales, Inc.,*
4 B.R. 635, 645 (Bankr.E.D.N.Y.1980) ................................................. 20

*In re Clinton Centrifuge. Inc.,*
85 B.R. 980, 984 (Bankr. E.D. Pa. 1988) ................................................. 18, 22

*In re Crescent Beach Inn, Inc.,*
22 B.R. 155 (Bankr.D.Me.1982) ................................................. 27

*In re Dragone,*
266 B.R. 268, 271 (D. Conn. 2001) ................................................. 24

*In re Eagle-Picher Industries, Inc.,*
176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) ................................................. 28, 29

*In re Fisher & Son, Inc.,*
70 B.R. 7 (Bankr. S.D. Ohio 1986) ................................................. 25

*In re General Oil Distributors, Inc.,*
42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) ................................................. 20, 21

*In re G-I Holdings, Inc.,*
295 B.R. 502, 510-11 (D. N.J. 2003) ................................................. 22

*In re Gibson & Cushman Dredging Corp.,*
101 B.R. 405, 410 (E.D.N.Y.1989) ................................................. 28

*In re Gilman Services, Inc.,*
46 B.R. 322, 327-28 (Bankr. D. Mass. 1985) ................................................. 27

*In re Grand Traverse Development Co. Ltd. Partnership,*
147 B.R. 418, 420 (Bankr. W.D.Mich. 1992) ................................................. 23, 27, 28, 30

*In re Henry Mayo Newhall Memorial Hosp.,*
282 B.R. 444 (9th Cir. BAP 2002) ................................................. 29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iii

94851-001\DOCS_LA:189902.9

*In re Ionosphere Clubs, Inc.*,
113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990).................................................................. 18, 21

*In re Justus Hosp. Props. Inc.*,
86 B.R. 261, 267 (Bankr. M.D. Fla. 1988)................................................................. 18, 22

*In re Klein/Ray Broadcasting*,
100 B.R. 509, 511 (8th Cir. BAP 1987)........................................................................... 22

*In re Lehigh Valley Professional Sports Club, Inc.*,
2000 WL 290187 (Bankr. E. D. Pa. 2000)........................................................... 27, 28, 29

*In re Macon Prestressed Concrete Co.*,
61 B.R. 432, 439 (Bankr. M.D. Ga. 1986)........................................................................ 18

*In re Mako, Inc.*,
102 B.R. 809, 812-13 (Bankr.  E.D. Okla. 1988) ............................................................ 25

*In re Marvel Entertainment Group, Inc.*,
140 F.3d 463, 471 (3d Cir. 1998)......................................................................... 18, 21, 22

*In re Morpheus Lights, Inc.*,
228 B.R. 449, 454 (Bankr. N.D. Cal. 1998) .................................................................... 22

*In re PRS Insurance Group, Inc.*,
274 B.R. 381, 384 (Bankr. D. Del. 2001) ........................................................................ 18

*In re Revco D.S., Inc.*,
898 F.2d 498 (6th Cir. 1990) ........................................................................................... 26

*In re Royster Co.*,
145 B.R. 88 (Bankr. M.D. Fla. 1992) ........................................................................ 22, 23

*In re Sea Queen Kontaratos Lines. Ltd.*,
10 B.R. 609, 609 (Bankr. D. Me. 1981).......................................................................... 18

*In re Sharon Steel Corp.*,
871 F.2d 1217, 1226 (3d Cir. 1989)................................................................................ 18

*In re Situation Management Systems*,
252 B.R. 859 (Bankr. D. Mass. 2000) ............................................................................ 28

*In re Sletteland*,
260 B.R. 657, 672 (Bankr. S.D. N.Y. 2001)....................................................... 20, 23, 28

*In re Stein and Day, Inc.*,
87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988)...................................................................... 25

*In re Tabletalk, Inc.*,
22 B.R. 706, 710 (Bankr. D. Mass. 1982) ...................................................................... 27

*In re Texaco, Inc.*,
81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988)................................................................ 28, 29

*In re University Heights Ass'n, Inc.*,
2007 WL 316281, *3 (Bankr. N.D.N.Y. 2007) ............................................................. 22

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iv

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re W.R. Grace & Co.*,
   2002 Bankr. LEXIS 1241 (Bankr. D. Del. 2002) ........................................................ 24

*Matter of Interco Inc.*,
   137 B.R. 999 (Bankr. E.D.Mo. 1992) ........................................................................ 27

*Petit v. New England Mort. Servs.*,
   B.R. 64, 69 (D. Me. 1995) ........................................................................................ 21

*Pickens Industries, Inc. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*,
   68 B.R. 712 (N.D.Tex.1986) ..................................................................................... 27

*Smart World Technologies, LLC et al., v. Juno Online Services, Inc.*
   *(In re Smart World Technologies, LLC)*, 423 F.3d 166, 176 (2nd Cir. 2005) ................... 18

**Statutes**

11 U.S.C. § 1121 ................................................................................... 25, 28, 29

Rule 201 of the Federal Rules of Evidence ............................................................... 5

Section 549 of the Bankruptcy Code ..................................................................... 21

Section 1104 of the Bankruptcy Code ..................................................... 17, 18, 25, 26

Federal Rule of Bankruptcy Procedure 9017 ............................................................ 31

Local Bankruptcy Rule 9013-1 ............................................................................. 31


**Other Authorities**

*5 Collier on Bankruptcy*, ¶ 1104.01 (15th ed. 1983) ................................................ 20

*7 Collier on Bankruptcy*, ¶ 1104.02 (15th ed. Rev. 2006) ..................................... 18, 24

*Kenneth N. Klee & K. John Shaffer, Creditors' Committees
   Under Chapter 11 of the Bankruptcy Code,*
   44 S.C. L. Rev. 995, 1045, 1049 (1993) ................................................................ 20

*H.R.Rep.No. 595, 95th Cong., 1st Sess. 220 (1977)* ................................................. 21

*U.S. Code Cong. & Admin. News, 1978, pp. 5787, 6179, 6180* ................................... 21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Woodside Group, LLC, *et al.*, the debtors and debtors in possession in the above-captioned

2    cases (the "Debtors"), hereby oppose (A) the *Motion of the Ad Hoc Group of Noteholders for Entry*

3    *of an Order Directing the Appointment of a Chapter 11 Trustee, or, Alternatively, Directing Both*

4    *(I) the Appointment of an Examiner for Certain Specified Purposes and (II) the Termination of the*

5    *Debtors' Exclusive Periods in Which to File and Confirm a Plan* (the "Trustee Motion"), filed by

6    the Ad Hoc Group of Noteholders (the "Noteholder Group") and joined by JP Morgan Chase Bank

7    ("JP Morgan"), as administrative agent for certain lenders (the "Bank Group"); and (B) the Motion

8    to Terminate or Reduce the Debtors' Exclusivity Period (the "Exclusivity Motion"), filed by the

9    Bank Group, and in support of such opposition, respectfully represent as follows:

I.

### INTRODUCTION

12    The appointment of a chapter 11 trustee in these cases is not justified.  The law in this

13    circuit and elsewhere reflects a strong policy preference that a debtor in possession be permitted to

14    operate and manage its business and reorganization effort, subject to the numerous substantive and

15    procedural safeguards imposed by the Bankruptcy Code.  Appointment of a trustee is a draconian

16    remedy that is warranted only in extreme circumstances.  No such circumstances exist here.  The

17    Debtors are 187 entities with over $1 billion in assets and little secured debt.  They have

18    historically been, and remain, among the best-managed companies in the industry.  They consented

19    to the entry of orders for relief only nineteen days ago.  They immediately implemented and

20    obtained judicial approval for procedures for the proper and orderly administration of these large

21    bankruptcy cases as debtors-in-possession.  There is no long history of stalled or failed negotiations

22    with creditors.  To the contrary, the two largest creditor constituencies presented concrete proposals

23    for a plan only recently, do not even have a unified position or approach and have not responded to

24    the Debtors' plan counterproposal.  There is no evidence that acrimony will preclude effective

25    reorganization (and the Noteholder Group and Bank Group are not entitled to obtain relief simply

26    by acting recalcitrant).  At best, the motion is premature.

27    The Noteholder Group cannot meet its burden of adducing clear and convincing evidence of

28    fraud, dishonesty, incompetence or gross management in support of its Trustee Motion.  The scant

2

1    competent evidence it presents is insufficient to justify depriving the Debtors of their rights under

2    the Bankruptcy Code at the very outset of these cases.  The principal basis that is offered for the

3    appointment of a trustee and the termination of exclusivity – the so-called "Tax Reorganization" –

4    was not a nefarious scheme to benefit the shareholders at the expense of the Debtors and their

5    creditors.  It was a change in the corporate form and ownership structure of certain Debtors that had

6    a legitimate business purpose and was tax-neutral to the Debtors.  There is no harm to the Debtors

7    from this restructuring, and neither the Noteholder Group nor the Bank Group even attempts to

8    present any evidence to the contrary.  The affected Debtors were (and remain) pass-through entities

9    for tax purposes.  Losses due to declining real estate values had resulted in a substantial write-down

10   of the Debtors' assets.  The write-down created substantial tax offsets that could only be utilized by

11   the taxpayers (*i.e.*, the principals).  These losses had to be recognized in the 2008 calendar year in

12   order to be taken as ordinary rather than capital losses, and avoid losing much of their value.  The

13   immediate recognition of these tax losses does not harm creditors, even if the value of the Debtors'

14   assets rises in the future and gains are subsequently realized.  The only beneficiary of delay would

15   have been the Internal Revenue Service.  And the suggestion that the Debtors dragged out workout

16   negotiations for months to buy time to implement a covert plan is flatly wrong: only three weeks

17   elapsed between the Bank Group's and Noteholder Group's first concrete proposals and the

18   restructuring.

19          Moreover, the Noteholder Group and the Bank Group knew all of this.  Their feigned shock

20   and indignation is belied by the fact that *the Noteholder Group and the Bank Group (1) knew about*

21   *the losses and the write-down; (2) knew and acknowledged that the shareholders would be entitled*

22   *to substantial tax refunds; (3) had already asserted that prior distributions made to shareholders to*

23   *pay the taxes now being refunded were recoverable; and (4) to the extent such claims are valid,*

24   *were looking to the refunds as a principal source of recovery on such claims.*  Not once did they

25   question that the refunds could only go to the shareholders who had paid the taxes.  The only

26   question was precisely *when* these steps would be taken, not *who* would receive the refunds.

27   Indeed, had the Debtors not acted this year, the Noteholder Group and Bank Group would

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

1   undoubtedly have accused them of gross mismanagement for *failing* to maximize the value of these

2   potential assets.

3       The other principal allegations in the Trustee Motion concern the transfer of title of certain

4   assets to Unrestricted Subsidiaries and their pledge to Zions Bank.  The sinister cast put upon this

5   transaction by the Noteholder Group is equally unfounded.  As the Debtors and Zions Bank[2] both

6   attest, and the Noteholder Group is well aware, the transfers were part of a the process of "truing

7   up" the respective borrowing bases of Zions Bank and the Bank Group, and were made pursuant to

8   a stipulation that ended litigation brought by Zions Bank.  The Noteholder Group has been

9   provided with a full analysis of the transfers.  The transaction was legitimate and completely above-

10  board.  In fact, two of the Noteholders are significant participants in the Zions Bank credit facility.

11  Neither of these transactions had an adverse impact on the Debtors or their creditors.

12      There is also no clear and convincing evidence that the appointment of a trustee would be in

13  the best interest of creditors or other parties in interest.  The contrary is true.  The Debtors are

14  among the best-managed companies in their industry.  Management's familiarity with market

15  conditions, land, inventory, vendors, products and competitors in the many geographic markets in

16  which the Debtors operate is irreplaceable.  Appointment of a trustee would jeopardize the

17  prospects for successful reorganization, greatly impair the administration of these cases, reduce

18  asset values, be extraordinarily costly and is unnecessary.  Even if any of the allegations of

19  prepetition conduct had merit, the substantive and procedural protections of the Bankruptcy Code

20  preclude their recurrence (particularly as they relate to notice of non-ordinary course transactions).

21  The Trustee Motion should be denied.

22      The balance of the relief sought in the Trustee Motion is also unwarranted.  The

23  appointment of an examiner would be wasteful and unnecessary, as the Noteholder Group

24  implicitly recognizes by requesting that its scope be limited to investigating claims against insiders.

25  All facts relevant to such alleged claims are already known by or readily available to the

26  Noteholder Group or the newly-appointed creditors' committee, and are easily obtained without the

27

28  [2] The Declaration of David S. Meeks, filed concurrently by Zions Bank, sets forth the facts concerning the Zions Bank
transactions.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

1  appointment of an examiner.  A formal "investigation" is both unnecessary and premature, pending

2  the proposal of a plan of reorganization.

3       Finally, the termination or reduction of exclusivity requested in both the Trustee Motion and

4  the Exclusivity Motion is wholly unwarranted.  These are extraordinarily large cases that have just

5  commenced and that have great potential for reorganization.  The Debtors have been afforded no

6  opportunity to propose a plan of reorganization.  There is virtually no case law supporting the

7  termination of exclusivity, and none whatsoever on these facts.  Exclusivity is not being used to

8  club unwilling creditors into negotiations.  Terminating exclusivity will not advance progress to

9  reorganization, and neither the Noteholder Group nor the Bank Group contends it is ready to file a

10  plan of reorganization.  Virtually every other factor relevant to the enlargement or reduction of a

11  debtor's exclusive period for filing and confirming a plan of reorganization also weighs strongly

12  against termination or reduction (except the assertions of acrimony, and the Noteholder Group and

13  Bank Group should not be permitted to obtain such relief through intransigence and utterly

14  contrived indignation).

15                                   **II.**

16                         **STATEMENT OF FACTS**

17  A.      **General Background**[3]

18       Woodside Group, LLC ("Woodside Group") and its affiliate entities (collectively, the

19  "Woodside Entities") operate one of the nation's largest privately held home building companies.

20  Woodside Group is the parent company of multiple subsidiaries and through approximately 185 of

21  those subsidiaries (the "Restricted Subsidiaries") is primarily engaged in homebuilding operations

22  in eight states.    Historically, approximately forty-two percent of the Restricted Subsidiaries'

23  homebuilding revenues were derived from their operations in California.    The Restricted

24  Subsidiaries also have significant homebuilding operations in Nevada, Arizona, Utah, Minnesota,

25  Florida, Maryland and Texas.    The operations of the Woodside Group are financed through

26

27  [3]  The background facts set forth in Sections A, B and D of the Statement of Facts are set forth in the Declaration of
Leonard K. Arave in Support of Emergency Motions, filed on September 16, 2008 [Docket No. 48], or are matters of
record subject to judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.  As specifically referenced

28  herein, other facts in support of this Opposition are set forth in the concurrently filed Declarations of Leonard K. Arave
and George C. Koutouras.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

1   Woodside Group's affiliate Pleasant Hill Investments, LC ("PHI").  Woodside Group, PHI and

2   each of the Restricted Subsidiaries are the Debtors.

3       Woodside Group also has subsidiaries that are engaged in business activities outside its

4   standard homebuilding operations (the "Unrestricted Subsidiaries").[4]  The Unrestricted Subsidiaries

5   purchase land from third parties, hold real estate, obtain zoning and other entitlements on longer-

6   term projects, reinsure the Restricted Subsidiaries, invest in joint venture projects with other

7   homebuilders, perform renovation work on governmental facilities and sell land to Restricted

8   Subsidiaries at market prices.

9       During 2007, the Woodside Entities generated revenues exceeding one billion dollars on a

10  consolidated basis.  As of December 31, 2007, the Woodside Entities had consolidated assets and

11  liabilities of approximately $1.5 billion and $1.1 billion, respectively.  As of the entry of orders for

12  relief in the above-captioned cases on September 16, 2008 (the "Relief Date"), the Debtors had

13  approximately $70 million in cash, and employed approximately 494 employees.

14  **B.    Debt Structure**

15      **1.    Institutional Debt**

16      PHI is the borrower under an unsecured credit facility (the "Credit Facility") provided by JP

17  Morgan, as administrative agent for the Bank Group.  Woodside Group and the Restricted

18  Subsidiaries are guarantors of PHI's obligations under the Credit Facility.  PHI also raised capital

19  through various unsecured senior note issuances with staggered maturities ranging from 2008

20  through 2015 (the "Noteholder Debt"), which are also guaranteed by Woodside Group and the

21  Restricted Subsidiaries.  As of the Relief Date, approximately $314 million in principal was

22  outstanding on the Credit Facility (the "Bank Debt") and approximately $372 million in principal

23  was owed on the Noteholder Debt.

24      The Unrestricted Subsidiaries are not borrowers or guarantors of the Bank Debt or the

25  Noteholder Debt and are not debtors in these or any other bankruptcy proceedings.  The operations

26

27  [4] The Unrestricted Subsidiaries are Liberty Holdings Group, LLC, Alameda Investments, LLC, JSO Land, LLC,
    Eagleridge Office Park, LLC, Wheatland Heritage Oaks, LLC, Hillsborough, LLC, WDS MTG, LLC, Atherton
28  Construction, LLC, Victory Holdings, LLC, Danville Land Investments, LLC, Bellvue Holdings, LLC, Walnut Creek
    Development, LLC, WSD SE1, LLC, WMI Holdings, LLC and Reliant Structural Warranty Insurance Company, Inc.
    The Unrestricted Subsidiaries are not debtors in bankruptcy proceedings.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of certain Unrestricted Subsidiaries and non-debtor affiliates are funded by a $130 million credit facility provided by Zions First National Bank ("Zions").

### 2. Joint Venture Liability

Woodside Group invests in a number of joint venture projects (the "Joint Ventures") with unaffiliated home builders and developers through two Unrestricted Subsidiaries: Alameda Investments, LLC and Liberty Holdings Group, LLC. The Joint Ventures develop projects (and in one instance, develop homes) that are funded through secured credit facilities, a number of which are guaranteed by members of the Joint Ventures or such members' parent companies. Woodside Group, PHI and/or certain Restricted Subsidiaries (the "JV Guarantors") entered into certain maintenance and re-margining agreements and provided certain unsecured guarantees for the benefit of secured lenders in connection with a number of Joint Ventures.

### 3. Bond Indemnity and Warranty Claims

Woodside Group maintains certain bonds in connection with its construction and Joint Venture activities with Travelers Insurance, Arch Insurance Company, the Insurance Company of the West, General Insurance Company of America, Developers Surety and Indemnity Co., Bond Safeguard Insurance Co. and American Motorists Insurance Company (the "Insurers"). Woodside Group, on behalf of itself and certain subsidiaries and affiliates, is party to indemnity agreements for the benefit of a number of the Insurers, pursuant to which it agrees to repay all sums paid and costs incurred under any bonds issued by such Insurers.

### 4. Ordinary Course Debt

In connection with their construction activities, trade creditors and subcontractors provide labor, material and services to the Restricted Subsidiaries, some of which are potentially secured by statutory liens. As of the Relief Date, Woodside Group estimates that the Restricted Subsidiaries have approximately $20 million in trade claims. Additionally, the funding by PHI of the Subsidiaries' operations are accounted for and reflected in intercompany note obligations.

### C. Loan Defaults and Negotiations

Beginning in 2005, Woodside Group's operations were negatively impacted by adverse real estate market conditions. Although the market continued to deteriorate over the next few years,

1   Woodside Group's markets turned significantly worse starting in the fourth quarter of 2007.
2   Problems in the mortgage industry reduced the supply of qualified home buyers.  With existing
3   home inventory levels spiking and a rapid increase in foreclosures, housing prices dropped
4   substantially and many buyers are waiting for further price reductions before entering the market.
5   In large part due to such market conditions and factors, the Bank Group elected to declare an event
6   of default under the Credit Facility in 2007.  By virtue of cross-default provisions, defaults under
7   the Noteholder Debt instruments were later triggered.

8   Subsequent to such defaults, the Debtors engaged in negotiations with the Noteholder
9   Group and the Bank Group for a global restructuring of their debt obligations.  The Bank Group's
10  consultants, FTI Consultants, Inc. ("FTI"), were given full access to Woodside Group's books and
11  records, its management and its consultants, Alvarez & Marsal ("A&M").  At all times, FTI
12  received everything that it requested. As part of that process and as conceded in the Declaration of
13  Dewey Imhoff in support of the Trustee Motion ("Imhoff Dec."), the Bank Group and Noteholder
14  Group were well aware that significant taxable income had been recognized and attributed to
15  shareholders in 2006 and 2007 (Imhoff Dec., ¶ 10), and that a substantial write-down of the
16  Debtors' assets had been taken at the end of 2007.  Imhoff Dec., ¶ 11.  The Noteholder Group and
17  Bank Group were also well aware, and have specifically acknowledged in their restructuring
18  proposals, that such a write down would naturally lead to the recognition of substantial losses that
19  could be carried back by the shareholders to recover substantial tax refunds.  Declaration of
20  Leonard K. Arave ("Arave Dec."), ¶¶8-9.  They were also aware or should have been aware that,
21  under current law, the loss carry-back is limited to two years, and so in order to recoup the
22  substantial taxes paid by the shareholders in 2006 and 2007, the losses would need to be triggered
23  in the current calendar year. *Id.*

24  Although the Noteholder Group and the Bank Group give the impression that the parties
25  have been negotiating without success since the beginning of 2008, that depiction is inaccurate.
26  The Debtors have stood ready to negotiate a global resolution, but at all relevant times through July
27  2008, the Noteholder Group and Bank Group insisted as a condition precedent to any further
28  negotiations that the Debtors enter into an onerous and unreasonable forbearance agreement that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  would have required the Debtors to provide collateral and make substantial payments,

2  notwithstanding the Debtors' willingness to enter a simple forbearance agreement and agreed

3  budget pending broader negotiations. Arave Dec., ¶ 4. Even in the absence of an agreed upon

4  forbearance agreement, the Debtors agreed to continue to operate within the budgets provided to

5  them. *Id.*

6  Further, the Bank Group insisted in early March 2008 that it was unwilling to discuss any

7  concrete proposal until completion of an asset evaluation by John Burns (the "Burns Report").

8  Arave Dec., ¶4. The Burns Report was not completed until June 2008. *Id.*, ¶5. The Bank Group

9  did not make a concrete proposal until July 3, 2008, and the Noteholder Group did not make any

10  proposal until July 9, 2008. *Id.*, ¶5. Significantly, the proposals of the Bank Group and the

11  Noteholder Group were fundamentally inconsistent, and both related to the same assets. *Id.* On

12  August 19, 2008 Woodside Group made a counter-proposal. *Id.* The Noteholder Group and the

13  Bank Group have not responded. *Id.*

14  **D.    Bankruptcy Proceedings**

15  On March 31, 2008, two of the Restricted Subsidiaries (Woodside AMR 107, Inc. and

16  Woodside Portofino, Inc.) filed voluntary chapter 11 petitions in this Court. On August 20, 2008

17  (the "Petition Date"), the Noteholder Group commenced the filing of involuntary petitions against

18  the other Debtors (the "Involuntary Petitions"). JP Morgan, on behalf of the Bank Group, filed

19  joinders in the Involuntary Petitions.

20  The Noteholder Group, JP Morgan and the Debtors reached certain agreements regarding

21  the resolution of the Involuntary Petitions, the Noteholder Motion and the Bank Motion, which

22  resolutions are reflected in the terms of the *Stipulation (I) Providing for the Entry of Orders for*

23  *Relief As to Involuntary Petitions, and (II) Granting, In Part, Gap Period Motions Filed by the*

24  *Noteholders and By JP Morgan Chase Bank, N.A.* (the "Stipulation") approved by the Court by

25  order entered on August 27, 2008.

26  In accordance with the Stipulation, on September 16, 2008 (the "Relief Date"), the Debtors

27  consented to the entry of Orders for Relief in these cases. The Debtors' cases are jointly

28  administered for procedural purposes. On the Relief Date, the Debtors filed motions for interim

9

94851-001\DOCS_LA:189902.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and final orders for, *inter alia*, approving continued sales of homes free and clear of liens and

2    interests, establishing procedures for the payment of secured and certain priority claims, approving

3    payment of certain tax obligations, approving their centralized cash management system, approving

4    payment of wage and benefit claims, and certain other relief customarily sought at the

5    commencement of large and complex chapter 11 cases.  On September 19, 2008, the Court granted

6    the interim or final relief requested.  The Debtors continue to operate as debtors-in-possession

7    pursuant to section 1107 of the Bankruptcy Code.  On October 2, 2008, the United States Trustee

8    appointed an Official Committee of Unsecured Creditors (the "Committee").

9    **E.    The Corporate Restructuring**

10    What the Noteholder Group and Bank Group pejoratively term the "Tax Reorganization"

11    was a transaction by which Woodside Group, Inc. (which was a subchapter S corporation) was

12    converted into a limited liability company.  In order to minimize the impact of this conversion at

13    the subsidiary level and simplify the corporate structure, about 105 Restricted Subsidiaries (which

14    were qualified subchapter S corporations) were converted and merged into 10 limited liability

15    companies and partnerships and 13 corporations were converted into limited liability companies

16    (the "Corporate Restructuring").  Arave Dec., ¶6.  The Trustee Motion and Exclusivity Motion (1)

17    neglect to mention that the Noteholder Group and the Bank Group were perfectly aware that a

18    transaction such as this, or a functionally similar transaction, would be undertaken; (2) omit that

19    they knew or should have known that it would occur this year; (3) omit that they have always

20    acknowledged that the refunds would belong to the shareholders; (4) fail to identify any harm to the

21    estate (for the reason that there is none); and (5) omit that they have already asserted claims based

22    on shareholder distributions and are looking to those refunds as a principal source of recovery on

23    such claims, if valid (and thus are potential beneficiaries of the Corporate Restructuring).

24

25

26    **1.    Description and Background**

27    The tax incentives for the Corporate Restructuring were substantial, and were well known to

28    the Noteholder Group and Bank Group.  Arave Dec., ¶7.  As a subchapter S corporation, Woodside

10

1    Group, Inc. was a "pass-through" entity for tax purposes such that, by operation of the Internal

2    Revenue Code (the "IRC"), the income from Woodside Group, Inc. was attributed to tits

3    shareholders for tax purposes. *Id.* The subsidiary Debtors, in turn, were organized as qualified

4    subchapter S corporations or as limited liability companies, which were also tax pass-through,

5    disregarded entities. *Id.* (PHI is a sister company, and was organized as a limited liability

6    company.)

7          As the Noteholder Group and Bank Group knew, Woodside Group, Inc. had recognized

8    substantial taxable income in 2006 and 2007.[5]  By operation of tax law, this income was attributed

9    to Woodside Group, Inc.'s shareholders for tax purposes.  Arave Dec., ¶8.  Consistent with

10   historical practice, and as the Noteholder Group and Bank Group also knew, the shareholders

11   received distributions, which were meant to assist the shareholders in paying the tax liability

12   attributed to them due to their ownership of shares as well as a return on their investment.[6] *Id.*

13         As a result of the market downturn, however, the value of the Woodside Group's assets had

14   declined significantly.   In June 2008, Woodside Group, Inc. produced consolidated financial

15   statements for the period ending December 31, 2007, which contained a write-down of assets by

16   approximately $384 million.  Arave Dec., ¶9.  The Noteholder Group and the Bank Group were

17   fully aware of these built-in tax losses.[7]  The Noteholder Group and the Bank Group were also

18   aware that recognition of these losses would generate substantial tax refunds for the shareholders, a

19   fact that was specifically reflected in their respective restructuring proposals. Arave Dec., ¶9. The

20   Noteholder Group and Bank Group were also aware, or should have been aware, of the two year

21   reach-back period for offsetting previously recognized income, and thus knew or should have

22   known that a transaction recognizing the Debtors' losses would have to be concluded by the end of

23   2008 in order to offset the substantial income that was recognized in 2006 and 2007.[8]  In fact, each

24   of their restructuring proposals to the Debtors specifically reflected their understanding that the

25   shareholders would be receiving substantial tax refunds on account of the losses taken by the

26   Debtors, and acknowledged and contained provisions relating to the potential contribution of some

27   [5] Imhoff Dec., ¶ 10.
     [6] Imhoff Dec., ¶ 10; Arave Dec., ¶8.
28   [7] Imhoff Dec., ¶ 11.
     [8] Imhoff Dec., ¶ 10.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11

94851-001\DOCS_LA:189902.9

1  portion of such tax refunds by the shareholders.  Arave Dec., ¶9.  Accordingly, notwithstanding

2  their feigned surprise and indignation, the nature of the Corporate Restructuring was no surprise to

3  the Noteholder Group or the Bank Group; indeed, Mr. Imhoff is careful to attest only that the

4  Debtors did not disclose the "consummation" of the transaction, not that they were surprised by the

5  nature of the transaction.[9]  Mr. Welch, for the Bank Group, states only that it was not disclosed

6  beforehand, and concedes that upon its request, Woodside Group caused the new entities to execute

7  joinders to the original guaranty.  Declaration of George "Buzz" W. Welch ("Welch Dec."), ¶¶ 27,

8  29.  There was never a question of *who* would receive the tax refunds, but only *when*.

9         There were additional valid business reasons for the Corporate Restructuring.  Arave Dec.,

10  ¶10.  The IRC has significant restrictions on the type of entity that may own stock in a subchapter S

11  corporation, and such restrictions do not exist in some other pass through entity forms, such as a

12  limited liability company.  Based on ongoing discussions with potential sources of investment

13  capital, the Debtors had been aware since January 2008 that the companies would be required to

14  convert from a subchapter S corporation and qualified subchapter S corporations to more flexible

15  entity structures in order to accommodate any form of outside investment and to avoid adverse tax

16  consequences.  Arave Dec., ¶10.  In addition, the Noteholder Group's own proposal would have

17  required the conversion to happen in order for the company to retain its pass-through status.  *Id.*

18  Thus, management understood that conversion of S corporations to limited liability companies or

19  limited partnerships would be economically advantageous for investors and creditors.  *Id.*  Ernst &

20  Young ("E&Y"), the company's tax advisors, also had been advising the company for several years

21  to consider converting to a limited liability company to deal with potential shareholder estate issues

22  as well as to provide ease of administration.  *Id.*  Historically, however, this was inadvisable due to

23  phantom income issues.  *Id.*

24         In addition, management had realized for several years that the existence of a large number

25  of entities was becoming an administrative and financial burden, as many Woodside Group entities

26  were dormant and/or had been established for limited purposes and were no longer needed, and

27  merger would both simplify the company structure and reduce the number of companies accruing

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[9] Imhoff Dec., ¶ 12.

1  tax liabilities. Arave Dec., ¶11. Many of the affected entities were inactive: of the 105 Restricted

2  Subsidiaries that were converted and merged in the Corporate Restructuring, approximately 43

3  involved closed (sold out) projects or otherwise had no ongoing operations. *Id.*

4       The transactions were consummated on or about July 25, 2008. Arave Dec., ¶6. E&Y

5  commenced analyzing the Corporate Restructuring in May 2008. *Id.* The consummation date was

6  three weeks after the Debtors first received a concrete restructuring proposal from the Bank Group,

7  and only two weeks after the Debtors received the Noteholder Group's first proposal. *Id.* It is

8  simply a mischaracterization to suggest that the Debtors were playing an elaborate game to string

9  their creditors along to facilitate some secret plan – even to the point of having "elective surgery"

10 rather than negotiating – when in fact it was the Debtors that were awaiting the creditors'

11 settlement proposals for most of the brief period that the Corporate Restructuring was in process.

12 Negotiations were not delayed in order to implement the Corporate Restructuring. *Id.*, ¶ 12.

13       **2.    Effect of the Corporate Restructuring**

14       The Trustee Motion and Exclusivity Motion contain *no* evidence of harm to creditors from

15 the Corporate Restructuring. Indeed, although the Noteholder Group asserts in argument that "[tax]

16 issues serve a central role in the development of any bankruptcy plan of reorganization" (Trustee

17 Motion at 9), its declarant, Mr. Imhoff (a senior managing director of FTI), refrains *completely*

18 from attesting to any harm to creditors or any preclusion of reorganization options. Mr. Welch also

19 makes no such suggestion. That is because there was not and could not be any such harm.

20       As described in the Trustee Motion, the tax effect of the Corporate Restructuring is that

21 Woodside Group, Inc. as a corporation will be deemed to have sold its assets, and then re-

22 contributed the assets to the newly converted Woodside Group, a limited liability company. The

23 inside tax basis of the assets will be adjusted to the greater of their fair market value or the total

24 debt. Imhoff Dec., ¶ 16. As of June 30, 2008, the fair market value of the assets was assumed to be

25 $1.3 billion, and the outstanding debt of the Debtors was $1.28 billion, including approximately

26 $300 million of intercompany debt owed to PHI. Arave Dec., ¶13.

27       9.    The write down of the value of the Debtors' assets does not adversely affect the

28 economic or pecuniary interests of the Debtors' creditors. *See* Declaration of George C. Koutouras

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13

1  ("Koutouras Dec."), ¶ 11.  Critically, as the Debtors understood, *the tax basis of the assets cannot*

2  *be written down lower than the amount of the debt.*  Koutouras Dec., ¶ 9; Arave Dec., ¶ 13.  This

3  creates two scenarios: (1) if the assets ultimately sell for <u>less</u> than the written down basis, then there

4  is no gain, no tax and no detriment arising from the Corporate Restructuring; or (2) if the assets are

5  sold for <u>more</u> than the basis, *i.e.*, for more than the Debtors' debt, then *by definition* the Debtors are

6  solvent and such gains will only increase the members' equity, and since Woodside LLC is a pass

7  through entity, the members (who are in the money if the new tax basis is correct) will be

8  responsible for the tax liability (and indeed, can receive distributions to pay for the taxes).

9  Koutouras Dec., ¶¶ 11-12.  In fact, because the amount of debt that will serve as the adjusted tax

10  basis includes $330 million of intercompany debt owed to PHI, members would be in the money

11  when the value of their assets rises to within $330 million of the adjusted tax basis, *i.e.*, when the

12  value of their assets exceeds their debt to third parties.  Arave Dec., ¶ 13.

13        The relative simplicity of this analysis belies the Noteholder Group's argument that

14  management should be deemed unfit to fulfill the duties of the Debtors as debtors-in-possession.

15  Perhaps because it is aware that no harm can be established, the Noteholder Group argues that

16  management should be displaced because it failed to *consider* whether creditors would be harmed

17  by the reduction in tax basis.  There is no evidence of that other than Mr. Imhoff's hearsay

18  testimony that he saw a presentation prepared by E&Y that "is silent on the issue of bankruptcy tax

19  planning."  Imhoff Dec., ¶ 17.  In fact, the "E&Y Presentation" states that "[t]he basis of the assets

20  contributed to the partnership will be the greater of FMV of the assets or the debt."  Arave Dec.,

21  ¶13.  The Debtors considered and concluded that because the tax basis of the assets could not be

22  written down below the amount of debt, the transaction could not have an adverse impact on

23  creditors.  *Id.*, ¶13.  This straight-forward analysis was correct.

24  F.    **The Zions Transfers**

25        The other allegations that are said by the Noteholder Group to support the appointment of a

26  trustee involve certain Unrestricted Subsidiaries (non-debtors) that are borrowers under a $130

27  million credit facility sponsored by Zions (which the Trustee Motion refers to amusingly as a "local

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Utah bank" as if to cast suspicion on the bona fides of the subject transactions). Trustee Motion at 10.

The Noteholder Group asserts generally that "the operations of the Non-Debtor Affiliates are inherently tied to those of the Debtors" due to overlapping management, intercompany debt obligations in favor of the Debtors, and because the Debtors provide services and corporate overhead to the non-debtor entities that result in continuing claims against such entities. *Id.*[10] The meat of the argument, though, is that in June 2008, management transferred a number of assets that were titled to Restricted Subsidiaries to the Unrestricted Subsidiaries that are borrowers from Zions. *Id.* at 11. The Noteholder Group acknowledges being advised that the transfers were made to correct errors by which the relevant properties were titled to the wrong entities (Trustee Motion at 11), but argues that regardless of the rationale, "the transfers demonstrate a fundamentally flawed understanding of bankruptcy process and a gross mismanagement of companies that were approaching potential bankruptcy filings." *Id.* Finally, it complains that management granted liens to Zions in response to litigation, and that such pledges potentially subordinated potential intercompany claims and were also a bad deal, in exchange for a three month standstill. *Id.* at 12.

These allegations are spurious, and the Noteholder Group knows it. It complains of "covert pre-petition steps" in favor of "a local Utah bank" when two of the Noteholders, Bank of America and Key Bank, have substantial participation interests in the Zions credit facility. Arave Dec., ¶18. In fact, the property transfers were completely legitimate and above-board. As the declarants for both Zions Bank and the Debtors attest, each of the six properties that were transferred was part of the borrowing base for the Zions credit facility, and was not part of the borrowing base of the Bank Group. Arave Dec., ¶16. While there may be different parts of a single project on different borrowing bases, there are no properties that are on both borrowing bases. *Id.* Each of the transfers was made as part of the process of "truing up" the respective borrowing bases, after the Debtors recognized that certain properties were titled to the wrong entities. *Id.* To the extent there are also properties that are titled to Unrestricted Subsidiaries that should be titled to the Debtors as

---

[10] The latter issue – the provision of intercompany services – was resolved in the agreement on the Debtors' cash management motion at the hearing on September 19, 2008. The issue of intercompany claims is addressed below.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

determined by the borrowing base for the Debtors, Zions has indicated it will consent to such transfers. Notably, Zions gave the Noteholder Group and Bank Group a full analysis and description of the assets involving this issue on the date the Trustee Motion was filed, and did not receive any communication or indication that the explanation was anything less than satisfactory to the Noteholder Group and the Bank Group. *Id.*

The Noteholder Group asserts with no evidentiary basis that the value of the property transferred was $13-30 million. Zions has informed the Debtors that the value of the transferred properties is approximately $13 million. Arave Dec., ¶17, Exh. A. This would represent approximately 1%-2% of the Debtors' assets (and does not take into account properties that are to be transferred back to the Debtors as part of the true-up). The cause of the mix-ups and the need for the transfers vary but in each case was innocent. *Id.*, Exh. A.

The Noteholder Group argues without any evidentiary basis that management should not have pledged collateral to Zions in the first place, and that such pledges may adversely affect the Debtors' creditors by subordinating intercompany debt (and thus demonstrate "gross mismanagement"). But it is the Noteholder Group's analysis that is deficient. Any intercompany claims were *already structurally subordinated to obligations to Zions.* With some insubstantial exceptions, nearly all intercompany obligations owed by Unrestricted Subsidiaries run from Victory Holdings or Liberty Holdings, whereas the assets that were pledged are held by lower-level subsidiaries that are Zions borrowers. Arave Dec., ¶19. Because the lower-level subsidiaries' obligations to Zions must be satisfied before funds flow upstream from such entities to Victory Holdings or Liberty Holdings, intercompany company claims were already structurally subordinated in any event. *Id.*

The Noteholder Group attacks the grant of collateral to Zions in exchange for the standstill agreement, particularly since the Debtors did not offer them the same deal. There is a difference, however. Zions had a contractual provision enabling them to get security upon a default, and the Noteholder Group did not. Arave Dec., ¶19. Simply put, management got the best deal it could, and there is nothing in the record to second-guess the decision, much less conclude that it was mismanagement of any kind. *Id.* Even if there was no such justification, preferring one creditor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

over another is a preference, not the basis for the appointment of a trustee.  Indeed, at least two of
the members of the Bank Group, Bank of America and Key Bank, were beneficiaries of the
transfers in question, and were fully informed of the necessity of the title corrections.  *Id.*, ¶18.

## G.    Adverse Consequences From Appointment of a Trustee

Displacing management by the appointment of a chapter 11 trustee could devastate the
Debtors' business and reorganization prospects.  Arave Dec., ¶ 20.  The Debtors are among the
best-managed companies in their industry.  The Debtors operate in geographically diverse markets.
The ability to sell homes in those markets is highly dependent upon management's familiarity with
the properties, development processes, customers, and vendors in those markets.  Three of the
Debtors' senior managers have been with the Debtors for over 23 years and have a combined 85
years of industry experience.  Management has attained a level of knowledge and expertise and
established personal relationships with critical vendors that would be impossible for a trustee to
duplicate quickly, if ever.  *Id.*

Further, the nature of the Debtors' business is highly dependent upon personal relationships
with vendors and employees.  There is a substantial risk that key employees would leave if a trustee
were appointed, and management is singularly able to preserve these fragile relationships and
maintain the confidence of the business community.  *Id.*, ¶ 21.  In a distressed real estate market
such as this, management's proven track record in the industry is even more essential, and the
replacement of proven management with a trustee could have devastating consequences for the
company and its creditors, employees and interest holders.  *Id.*

### III.

### ARGUMENT

Section 1104(a) of the Bankruptcy Code provides for the appointment of a trustee:

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the
affairs of the debtor by current management, either before or after the commencement of the
case, or similar cause . . .; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other
interests of the estate. . . .

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

1    11 U.S.C. § 1104(a). The party seeking appointment of a trustee has the burden of establishing the

2    need for such appointment by clear and convincing evidence. *In re Marvel Entertainment Group,*

3    *Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir.

4    1989); *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 384 (Bankr. D. Del. 2001); 7 Collier on

5    Bankruptcy, ¶ 1104.02[4][b], at 1104-24 (15th ed. Rev. 2006) (evidentiary standard should be clear

6    and convincing).

7    **A.      There is a Strong Presumption That Management Should Not be Displaced**

8            As courts have noted, the "standard for § 1104 appointment is very high." *Smart World*

9    *Technologies, LLC et al., v. Juno Online Services, Inc. (In re Smart World Technologies, LLC)*,

10   423 F.3d 166, 176 (2nd Cir. 2005). The appointment of a chapter 11 trustee represents an

11   "extraordinary remedy." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990);

12   *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (and cases cited

13   therein).

14           Accordingly, there is a "strong presumption" that a debtor's current management should not

15   be displaced by a chapter 11 trustee. *Marvel Entertainment Group*, 140 F.3d at 471; *In re Clinton*

16   *Centrifuge Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa. 1988) ("I note, as have many other courts, that

17   there is a strong presumption in chapter 11 that the debtor is to continue in control and possession

18   of its business"). *See also In re Justus Hosp. Props. Inc.*, 86 B.R. 261, 267 (Bankr. M.D. Fla. 1988)

19   ("there is a strong presumption in favor of leaving a reorganizing debtor in possession in charge of

20   its operations"); *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 439 (Bankr. M.D. Ga. 1986);

21   (same); *In re Sea Queen Kontaratos Lines. Ltd.*, 10 B.R. 609, 609 (Bankr. D. Me. 1981) (same).

22           That presumption is especially strong when the debtor is a closely held entity. *In re 4 C*

23   *Solutions, Inc.*, 289 B.R. 354 (Bankr. C.D. Ill. 2003) (preference for retention of Chapter 11

24   debtor's current management, as opposed to having a trustee appointed, is stronger where debtor is

25   a closely-held entity whose reputation and good will is closely identified with its owners and/or

26   management team).

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    **B.    The Corporate Restructuring and Zions Transfers Do Not Constitute Fraud,**

2    **Dishonesty, Incompetence, or Gross Mismanagement**

3        The Corporate Restructuring was undertaken prior to bankruptcy.  It did not constitute

4    fraud, dishonesty, incompetence or gross mismanagement.  Does it benefit the shareholders by

5    generating tax refunds?  Of course it does.  Are the shareholders entitled to the tax refunds?  Yes,

6    they are.  Did it harm the Debtors or their creditors?  No, it did not.  The tax losses had no utility to

7    creditors.  Did failing to provide advance notice to the Noteholder Group or Bank Group constitute

8    fraud, dishonesty, incompetence or gross mismanagement?  No, it did not.

9        The opposite is true.  The Noteholder Group and Bank Group were aware of the large

10    amounts of income recognized by the Debtors in 2006 and 2007, and aware that large distributions

11    were made to shareholders in 2006 and 2007 to assist them with the taxes that accrued to them.

12    They were also aware that the Debtors had subsequently suffered large losses, taken a large write-

13    down, and that recognition of those losses would trigger large tax refunds to the shareholders.

14    They claim that the Debtors are entitled to recover prior distributions.  If those claims are valid,

15    maximizing the refunds is in their best interest, because it creates a pool of funds that would likely

16    be the primary source of any recovery (since there is no dispute that all or most of the original

17    distributions were paid over to the IRS).  Had the Debtors not undertaken the Corporate

18    Restructuring, or waited to consummate it until next year (when they could no longer take losses of

19    ordinary income), this asset pool would have been largely lost.  At best, the Corporate

20    Restructuring maximizes this potential asset.  At worst, it is tax-neutral to creditors.  Simply put,

21    this was not mismanagement of any kind.

22        The Zions Transfers also present no cause to appoint a trustee.  The transfers of a minimal

23    number of properties from Restricted Subsidiaries to Unrestricted Subsidiaries was part of a true-up

24    of properties comprising the respective borrowing bases of the Zions lenders and the Bank Group.

25    The minimal amount of transfers, and the fact that there are also properties to be transferred in the

26    other direction (to which Zions will consent) corroborate that these transfers were not part of any

27    scheme to loot the Debtors and transfer assets to non-debtors, as the Noteholder Group seeks to

28    imply.  Pledging property of such non-debtors to Zions in resolution of litigation was not improper,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

1    and had no material effect on intercompany claims, which were structurally subordinated to Zions

2    Bank debt in any event.    In short, nothing about these transfers raises any issue of fraud,

3    dishonesty, incompetence or gross mismanagement .

4    **C.    Appointment of a Trustee is Unwarranted Where the Alleged Prepetition**

5    **Mismanagement or Misconduct is Unlikely to Recur in Chapter 11**

6         "[O]n a motion for the appointment of a trustee, the focus is on the debtor's current

7    activities, not past misconduct. Speculation that a debtor may do something in the future does not

8    overcome the strong presumption that the debtor should be permitted to remain in possession in a

9    Chapter 11 case or justify the additional costs of a trustee." *In re Sletteland*, 260 B.R. 657, 672

10   (Bankr. S.D.N.Y. 2001) (citations omitted; emphasis added); *Ad Hoc Committee of Bondholders v.*

11   *Citicorp Venture Capital Ltd. (In re Fairwood Corporation)*, 2000 WL 264319, *14-15 (S.D.N.Y.

12   2000), *aff'd*, 242 F.3d 364 (2d Cir. 2001).   Indeed, "one would expect to find some degree of

13   incompetence or mismanagement in most businesses which have been forced to seek the

14   protections of chapter 11."    *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645

15   (Bankr.E.D.N.Y.1980); *see also* 5 Collier on Bankruptcy 1104.01[c] at 1104-21 (15th ed. 1983)

16   ("The language of subsection (a)(1) represents tacit recognition that some degree of

17   mismanagement exists in virtually every insolvency case. The philosophy of chapter 11 is to give

18   the debtor a 'second chance' and, consistent with such philosophy, current management should be

19   permitted to identify and correct its past mistakes."); *In re General Oil Distributors, Inc.*, 42 B.R.

20   402, 409 (Bankr. E.D.N.Y. 1984) (most companies in bankruptcy have at least some degree of

21   incompetence or mismanagement, but appointment of a trustee is meant to be the extraordinary

22   exception rather than the rule).

23        Critically, where no ongoing danger to the estate persists, no justification for the burden and

24   expense of the appointment of a trustee exists. *See* Kenneth N. Klee & K. John Shaffer, Creditors'

25   Committees Under Chapter 11 of the Bankruptcy Code, 44 S.C. L. Rev. 995, 1045, 1049 (1993)

26   (noting that "the incremental costs" of a chapter 11 trustee typically "outweigh[] the benefits" and

27   "maximization of value rarely lies down this path.").

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

> The philosophy of chapter 11 is to give the debtor a "second chance" and, consistent with such philosophy, current management should be permitted to identify and correct its past mistakes. H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), U.S. Code Cong. & Admin. News, 1978, pp. 5787, 6179, 6180. While a certain amount of mismanagement of the debtor's affairs prior to the filing date may not be sufficient grounds for the appointment of a trustee, continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee.

*In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990);

There has been no determination that any of these transactions were improper. The Noteholder Group, Bank Group, the Committee and other constituencies will make their own assessment as to whether any of these transactions give rise to any claims on behalf of the estate; if so, there is no urgency to the assertion of such claims. For purposes of the Trustee Motion, what matters is that it cannot recur post-petition without approval of the Court. If it did, it would be an avoidable post-petition transfer pursuant to section 549 of the Bankruptcy Code. The same is true of the Zions Transfers. There is no danger of post-petition property transfers.

> [T]he basis for the strong presumption against appointing an outside trustee is that there is often no need for one: "The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." *Petit v. New England Mort. Servs.*, 182 B.R. 64, 69 (D. Me. 1995).

*Marvel Entertainment Group*, 140 F.3d at 471.

The safeguards inherent in the bankruptcy process offer protection against any breach of a debtor's fiduciary obligations. This case is a perfect example. Even assuming that management was inclined to breach their fiduciary duties, creditors are protected because no significant transaction can become effective without notice to creditors, an opportunity to object and court approval. *See In re General Oil Distributors, Inc.*, 42 B.R. at 410 (despite finding mismanagement, "[u]nder the watchful eye of G.O.D.'s creditors, the court is convinced that their interests are better served by permitting Gerald to lead G.O.D. into reorganization, rather than by saddling the estate with the expense of a trustee and additional counsel."). *See also In re 4 C Solutions, Inc.*, *supra* (appointment of trustee not warranted where debtor-in-possession had able bankruptcy counsel, was fulfilling its obligations under the Bankruptcy Code, and was operating at a profit and there had been no fraud).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  **D.     The Mere Existence of Conflicts of Interest or Acrimony Do Not Justify the**

2  **Appointment of a Trustee**

3          The mere existence of purported conflicts of interest does <u>not</u> justify the appointment of a

4  trustee.  *In re Royster Co.*, 145 B.R. 88 (Bankr. M.D. Fla. 1992) (holding that appointment of

5  trustee or examiner is not warranted in Chapter 11 case although it was asserted that debtor's

6  current management is hopelessly involved with other interests); *In re Clinton Centrifuge, Inc.*, 85

7  B.R. 980 (Bankr. E.D. Pa. 1988) (conflicts alone do not constitute mismanagement required to

8  invoke the extraordinary remedy of appointing a trustee); *In re Justus Hospitality Properties, Ltd.*,

9  86 B.R. 261, 266-67 (Bankr. M.D. Fla. 1988) (despite allegations that major creditor dominated

10  debtor and other allegations of conflicts of interest between debtor, management, general creditors

11  and equity, the court refused to appoint trustee where the evidence of fraud or gross

12  mismanagement was insufficient); *In re Klein/Ray Broadcasting*, 100 B.R. 509, 511 (8th Cir. BAP

13  1987) (affirming that appointment of trustee was not necessary because there was no evidence

14  debtor had acted improperly, notwithstanding conflicts).

15          The Noteholder Group cites *In re Morpheus Lights, Inc.*, 228 B.R. 449, 454 (Bankr. N.D.

16  Cal. 1998) for the proposition that appointment of a trustee is appropriate whenever there is any

17  doubt whether management will carry out its fiduciary duties.  Trustee Motion at 13.  The case does

18  not stand for that surprising proposition.  The cited section involved a creditor's inability to bring

19  an equitable subordination claim and suggested that where a debtor in possession declines to

20  perform fiduciary duties, such as to move to set aside an alleged fraudulent transfer, a remedy is to

21  petition for appointment of a trustee.  It does not suggest that such a drastic remedy can be based on

22  a "doubt" or "expectation" of malfeasance.

23          "There is no per se rule by which mere conflicts or acrimony between debtor and creditor

24  mandate the appointment of a trustee."  *In re Marvel Entertainment Group, Inc.*, 140 F.3d at 473.

25  Indeed, "acrimony between a debtor and its largest creditor is not unusual in the bankruptcy arena."

26  *In re University Heights Ass'n, Inc.*, 2007 WL 316281, *3 (Bankr. N.D.N.Y. 2007).  The

27  Noteholder Group's indignation, feigned or genuine, does not warrant a trustee.  *See In re G-I*

28  *Holdings, Inc.*, 295 B.R. 502, 510-11 (D. N.J. 2003) (creditor's committee was not able to

1    adequately prove to the court, under the clear and convincing standard, that the controlling

2    shareholder engaged in acts of self interest or abused its control over the debtor by trying to

3    'salvage equity' for himself); *cf. In re Grand Traverse Development Co. Ltd. Partnership*, 147 B.R.

4    418, 420 (Bankr. W.D.Mich. 1992) (to terminate exclusivity based on acrimony "would permit

5    litigious creditors to manufacture 'cause' to shorten the exclusivity period through their own

6    unilateral actions.").

7    **E.    The Appointment of a Trustee is Unnecessary Since the Noteholder Group or Other
         Estate Representative Can Take All Appropriate Actions**

8
9    A Committee has been appointed in this case.  The ability of the Committee or other

10   creditors to employ the discovery tools incorporated into the bankruptcy process to investigate the

11   Debtors will "ordinarily make it particularly inappropriate to impose on the estate, and probably on

12   these same creditors, the sizable cost of a trustee ....  [I]t would appear that the committee can

13   appropriately perform any necessary investigation." *Sletteland*, 260 B.R. at 672.

14   *In re Royster Co.*, *supra*, involved what the court described as a  "maze" of suspicious

15   transactions among the debtor and its non-debtor affiliates.  The court noted that "[a]s a general

16   rule, ... a trustee will not be appointed where affiliate transactions are called into question, unless

17   the movant can demonstrate that the transactions were improper, detrimental to the debtor estate, or

18   were actually fraudulent." *In re Royster Co.,* 145 B.R. at 90 (citation omitted).  In denying the

19   appointment of a trustee, the court observed that the "Committee is in a position to ensure that any

20   Plan of Reorganization must contain a provision for the appointment of independent counsel who,

21   post-confirmation, will have the right to investigate these transactions and if warranted, to pursue

22   what actions might be appropriate against any of the non-debtor entities involved on behalf of the

23   general estate and for the benefit of the unsecured creditors." *Id.* at 91.

24   Confirming this point, the Noteholder Group itself states *"it is difficult to imagine the*

25   *Noteholders (or the Bank Lenders) supporting any plan of reorganization that does not include the*

26   *formation of a litigation trust to pursue claims against the senior managers."* Trustee Motion at 2

27   (emphasis added).

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   The availability of such effective and more cost-effective remedies than the appointment of

2   a trustee – as well as the possibility that such issues may be resolved short of litigation – warrants

3   denial of a motion to appoint a trustee. *In re W.R. Grace & Co.*, 285 B.R. 148 (Bankr. D. Del.

4   2002) involved, in part, consideration of whether to appoint an examiner, limited trustee or plenary

5   trustee to prosecute fraudulent transfer claims. In denying such relief, the Court stated:

6   > [A] trustee is unnecessary to achieve the goal sought by all of the
7   > parties. The arguments of the Personal Injury Committee pre-
>   suppose that there is no other way to prosecute the fraudulent
8   > conveyance action; if the same result can be obtained by other means,
>   the interest of the creditors and the estate do not demand that a trustee
9   > be appointed. . . . [T]his case has not yet arrived at the point where
>   the last resort must be taken.

10  *Id.* at 160; *see also In re Fairwood Corporation*, *supra*, 2000 WL 264319 at *14-15 ("other

11

12  remedies were or are available to these creditors and constituted the appropriate path to trod, rather

13  than the sought for extraordinary remedy of conversion or the appointment of a trustee.").

14  If the Noteholder Group is correct that valid claims exist against equity holders and the

15  Unrestricted Subsidiaries, <u>something that has not even remotely been established</u>, such claims

16  may be resolved through a plan of reorganization, settlement or investigation and litigation by

17  the Committee or another estate representative. There is no need for the draconian remedy of

18  appointment of a trustee.

19  **F.    Appointment of a Trustee Would Result in no Discernible Benefit, and is far
        Outweighed by the Burden Upon the Estate**

20  "[A] court considering a motion to appoint a trustee should generally balance the benefit

21  to be gained . . . against the detriment to the reorganization effort and the rights of the debtor . . .

22  . 7 *Collier on Bankruptcy*, ¶ 1104.02[3][a], at 1104-10 (15th ed. Rev. 2006)." *In re Dragone*,

23  266 B.R. 268, 271 (D. Conn. 2001) ("Beside the dislocation caused by the appointment of a

24  trustee, the Court must also consider the cost of the trustee and balance the harm of such an

25  appointment against the benefits of a trustee's appointment."). This balancing, with the

26  paramount interests of creditors in mind, is a long–standing principle of bankruptcy law,

27  predating the Bankruptcy Code:

28  > A policy of flexibility pervades the Bankruptcy Code with the
>   ultimate aim of protecting creditors. "To require the appointment of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

24

> a trustee, regardless of the consequences, in the event of an act of the debtor, however slight or immaterial, could frustrate the purpose of the bankruptcy act. Section 1104(a)(1), therefore, must be construed, if possible, to make it harmonious with the act in its entirety. Such construction requires that the Courts be given discretionary authority to determine whether conduct rises to the level of 'cause.'

*In re Mako, Inc.*, 102 B.R. 809, 812-13 (Bankr. E.D. Okla. 1988).

No legitimate benefit would be conferred by the appointment of a trustee. A trustee would have no greater authority to pursue avoidance claims than the Committee or other estate representative. On the other hand, the detriment that would result from the appointment of a trustee is both certain and substantial. Woodside Group is one of the largest privately-held homebuilders in the country. It is a well-managed company, with a track record of profitability and margins that exceed the industry average. It has extremely experienced senior management. It operates in many geographic markets, and management's familiarity with local inventory, market conditions, product, inventory, vendors and competitors is essential to maintaining the company's viability in this distressed market. Management's knowledge of the business and expertise would be lost if a trustee were appointed. There is a risk that key employees would leave. The costs of administration would increase dramatically. Services would be duplicated. The Debtors' progress towards a plan of reorganization would be delayed while the trustee became familiar with these estates and would be thrown into chaos due to the termination of the Debtors' exclusivity. 11 U.S.C. § 1121(c)(1). *In re Stein and Day, Inc.*, 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988) (appointment of trustee was not in the interest of creditors because, *inter alia*, the "current management's experience and knowledge were essential to the debtor's future").

*In re Fisher & Son, Inc.*, 70 B.R. 7 (Bankr. S.D. Ohio 1986), involved a real estate developer that consented to an order for relief in an involuntary proceeding. The lender promptly moved for appointment of a trustee. The court held, in part, that the administrative burden of a trustee outweighed the advantage, even where there was evidence that an independent trustee could obtain financing to complete development. *Id.* at 8-9. The court further held that the motion was premature, where the initial 120-day exclusivity had not expired, creditors were active and should be able to force maximization of value of the debtor's assets, the debtor and creditors agreed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

25

1   liquidation of properties was the appropriate and likely goal, which the court believed the debtor

2   was better able to accomplish than a third party unacquainted with potential purchasers or attributes

3   of debtor's partly-completed residential dwellings. *Id.* at 9.    While the Noteholder Group may

4   argue that there is no agreed strategy in this case, it is premature to conclude that no consensus will

5   be reached, not least because the largest creditors, the Noteholder Group and the Bank Group, do

6   not yet have an agreed strategy even between themselves.    Whatever the outcome, current

7   management will be best qualified to implement it.    Finally, as in this case, the lender argued that

8   the shareholder/principals were benefiting at the expense of the estate, by occupying estate property

9   without payment.    The court found this insufficient to establish bad faith, fraud, gross

10  mismanagement, or other egregious behavior by the debtor. *Id.* at 8.

11      Here, there is simply no benefit to these estates or their creditors from the appointment of a

12  trustee. It is not needed to prevent anything bad from happening, it is not needed to investigate and

13  prosecute claims, and it will delay rather than advance the reorganization process. It serves only to

14  deprive the Debtors of the rights afforded to them under the Bankruptcy Code.

15  **G.      There Is No Need For The Estate To Fund An Examiner**

16      The Noteholder Group does not address the obvious inefficiency and economic waste

17  inherent in its request to appoint an examiner. Rather, it focuses upon the fact that the appointment

18  of an examiner is "mandated," given the size of this case.[11]    While the Bankruptcy Code appears to

19  mandate the appointment of an examiner, it gives the Court complete flexibility to determine the

20  scope of the investigation that the Court believes is "appropriate." *In re Revco D.S., Inc.*, 898 F.2d

21  498 (6th Cir. 1990) (court has discretion to "prescribe the parameters of examiners' investigations

---

[11] Bankruptcy Code § 1104(c) provides that:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor or of by current or former management of the debtor, if --
>
> (1)      such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> (2)      the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    as is appropriate."). There is also nothing mandatory in the Bankruptcy Code concerning requisite

2    compensation from the estate for such an examiner. *In re Gilman Services, Inc.*, 46 B.R. 322, 327-

3    28 (Bankr. D. Mass. 1985); *In re Tabletalk, Inc.*, 22 B.R. 706, 710 (Bankr. D. Mass. 1982).

4            Recognizing that its request for an examiner is not cost-justified, the Noteholder Group asks

5    the Court to limit the scope of such an appointment to "investigating any self interested transactions

6    by the Debtors' senior managers, in particular those described above." In other words, the

7    Noteholder Group requests the appointment of an examiner to seek information that the Noteholder

8    Group already has or which is readily available to it, in order to conduct an analysis that the

9    Noteholder Group and Bank Group have already conducted, or can readily conduct, but at much

10   greater cost to the estates and their creditors. The best interests of the estate are <u>not</u> served by the

11   provision of any further estate resources to any appointed examiner.

12   **H.    Exclusivity Should Not be Terminated**

13           The Noteholder Group and the Bank Group bear an "especially heavy" burden in

14   demonstrating adequate cause for termination of the Debtors' 120 day exclusivity period. *In re*

15   *Lehigh Valley Professional Sports Club, Inc.*, 2000 WL 290187 (Bankr. E. D. Pa. 2000); *Matter of*

16   *Interco Inc.*, 137 B.R. 999 (Bankr. E.D.Mo. 1992).

17           "In the 22 years since the exclusivity provision was promulgated in the Bankruptcy Reform

18   Act of 1978, there have been only two reported cases that permitted shortening the exclusivity

19   period: *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr.D.Me.1982), and *Pickens Industries,*

20   *Inc. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712 (N.D.Tex.1986), aff'd,

21   844 F.2d 1142 (5th Cir.1988)." *Lehigh Valley*, 2000 WL 290187 at *4; *In re Grand Traverse*

22   *Development Co. Ltd. Partnership*, 147 B.R. 418, 420 (Bankr. W.D.Mich. 1992) ("The parties have

23   submitted, and the court's research has uncovered only two cases that permitted shortening the

24   exclusivity period . . . ."). The facts of those cases involve internal divisions that paralyzed the

25   debtors and are completely distinguishable.[12] Acrimony with a creditor is equally likely to support

26

27   [12]   In *Crescent Beach Inn, Inc.*, the court reduced the 120 day exclusivity period based on acrimonious relations
     *between the debtor's principals*: "the major obstacle in the path to a successful reorganization in this case is the
     principal parties' acrimonious relations. They continue their bitter feuding not only at their own expense, but at the

28   expense of all creditors of the debtor." 22 B.R. at 160. The court in *Texas Extrusion* found that "this facet of *Crescent*
     *Beach* is amply matched in the instant case." 68 B.R. at 724. The debtor in that case, Louise Pickens, filed for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   extending exclusivity. "To hold otherwise would permit litigious creditors to manufacture 'cause'

2   to shorten the exclusivity period through their own unilateral actions." *Grand Traverse*

3   *Development, supra*, 147 B.R. at 419; *Lehigh Valley*, 2000 WL 290187, *4 (same); *In re Gibson &*

4   *Cushman Dredging Corp.*, 101 B.R. 405, 410 (E.D.N.Y.1989) (extension granted in light of

5   recalcitrance of creditors and their intent to liquidate rather than negotiate on an equitable plan of

6   reorganization).

7          The Noteholder Group inaccurately cites *In re Situation Management Systems*, 252 B.R.

8   859 (Bankr. D. Mass. 2000), for the proposition that acrimonious debtor/creditor relationship was

9   "one of the reasons the court terminated exclusivity." There is no such discussion in the case.

10   Instead, the court terminated exclusivity because the debtor had proposed an unconfirmable 'new

11   value' plan, any party was able to bid on the equity interest, and the largest creditor intended to bid.

12          Motions to terminate or reduce exclusivity have been consistently denied even in situations

13   where exclusivity had previously been extended and/or where creditors are at loggerheads with the

14   debtor. *See, e.g., Lehigh Valley, supra*; *In re Adelphia Communications Corp.*, 352 B.R. 578

15   (Bankr. S.D.N.Y. 2006) (denying bondholders' motion to terminate exclusivity after four years); *In*

16   *re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001) (denying motion by shareholder group to

17   dismiss case, or appoint examiner and terminate exclusivity); *Geriatrics Nursing Home, Inc. vs.*

18   *First Fidelity Bank, NA (In re Geriatrics Nursing Home, Inc.)*, 187 B.R. 128, 133 (D. N.J. 1995)

19   (reversing decision to terminate exclusivity during initial exclusive period where creditor

20   complained of unfair treatment); *In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988)

21   (movants had "not sustained their burden of establishing cause within the meaning of 11 U.S.C. §

22   1121(d) for modifying or terminating [the debtor's] exclusive right to proceed with its plan of

23   reorganization"); *In re Eagle-Picher Industries, Inc.*, 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994)

24   (court found no cause to terminate exclusivity where the grounds asserted were that the creditor

25   was being treated unfairly in negotiations and that an alternative plan would expedite prompt

26   resolution of case).

27

28   bankruptcy protection in an attempt to delay confirmation of a plan in a related case that had been filed by her husband
and related companies.

28

94851-001\DOCS_LA:189902.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The legislative history accompanying 11 U.S.C. § 1121 indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory. *In re Texaco, Inc.*, 81 B.R. at 812; *In re Eagle-Picher Industries, Inc.*, 176 B.R. at 147 (noting that there was no evidence of undue delay or that the continuation of exclusivity was being used as a tactical device to put pressure on creditors to accept a plan they think is unsatisfactory). Here, exclusivity is not being used as a club to drive the Noteholder Group or Bank Group into negotiating with the Debtors; indeed, they are <u>not</u> negotiating with the Debtors. Inasmuch as the cases just commenced, there has been no delay in the proposal of a plan, nor does either of the Noteholder Group or the Bank Group indicate that it is prepared to file its own plan, or that such filing would expedite the resolution of these cases.

Since there are virtually no decisions terminating or even reducing a debtor's exclusivity period, much of the case law cited by the Noteholder Group involves whether there is cause to <u>extend</u> the 120 day or 180 day exclusivity periods. Such case law has "marginal utility." *See Lehigh Valley*, 2000 WL 290187, *2 ("Notably, however, [such] cases arise in the context of requests to extend, not contract, exclusivity. Thus, the factors articulated in [such] decisions have marginal utility here since many of them assume the initial statutory [exclusivity] period has been afforded."). But even if a motion to terminate exclusivity at the very outset of a case was assessed under the same standards that applied routinely to motions to <u>extend</u> exclusivity, termination would still be unfounded. *In re Henry Mayo Newhall Memorial Hosp.*, 282 B.R. 444 (9th Cir. BAP 2002), upheld Judge Riblet's decision granting an extension where it was: (1) a first extension; (2) in a complicated case; (3) that had not been pending for a long time, relative to its size and complexity; (4) in which the debtor did not appear to be proceeding in bad faith; (5) had improved operating revenues so that it was paying current expenses; (6) had shown a reasonable prospect for filing a viable plan; (7) was making satisfactory progress negotiating with key creditors; (8) did not appear to be seeking an extension of exclusivity to pressure creditors; and (9) was not depriving the Committee of material or relevant information." *Id.* at 452. Every one of those factors would support an <u>extension</u> in this case (even if 120 days had passed, rather than 16), except, perhaps, that which relates to negotiations with key creditors. On that point: (a) such a conclusion would be

1   premature, and (b) creditors cannot manufacture their own "cause" by being litigious. *See Grand*

2   *Traverse Development, supra*, 147 B.R. at 420.

3        The Debtors respectfully submit that in a case of this size, so recently commenced, and on

4   such a sparse record, a decision to terminate or reduce exclusivity would be unprecedented. The

5   request should be denied.

8        [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

94851-001\DOCS_LA:189902.9

1

## IV.

## REQUEST TO COMPEL ATTENDANCE OF DECLARANTS

Pursuant to Local Bankruptcy Rule 9013-1(13)(A),[13] the Debtors request that the Court require the oral examination at the hearing of the declarants for the Noteholder Group and the Bank Group, Dewey Imhoff and George "Buzz" W. Welch, respectively.

## V.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court deny the Trustee Motion and the Exclusivity Motion in their entirety, and grant such other and further relief as is just and proper under the circumstances.

Dated:    October 2 2008              PACHULSKI STANG ZIEHL & JONES LLP

By    /s/ Jeremy V. Richards
      Jeremy V. Richards
      Linda F. Cantor
      Maxim B. Litvak
      [Proposed] Attorneys for the Debtors and
      Debtors in Possession

---

[13] "The court may, at its discretion, in addition to or in lieu of declaratory evidence, require or allow oral examination of any declarant or any other witness in accordance with F.R.B.P. 9017. When the court intends to take such testimony, it will give the parties 2 court days notice of its intention, if possible, or may grant such a continuance as it may deem appropriate."

31

94851-001\DOCS_LA:189902.9

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )

    I, Mary de Leon, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

    On October 2, 2008, I caused to be served **DEBTORS' OPPOSITION TO MOTION OF THE AD HOC GROUP OF NOTEHOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR, ALTERNATIVELY, DIRECTING BOTH (I) THE APPOINTMENT OF AN EXAMINER FOR CERTAIN SPECIFIED PURPOSES AND (II) THE TERMINATION OF THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE AND CONFIRM A PLAN; AND (B) MOTION TO TERMINATE OR REDUCE THE DEBTORS' EXCLUSIVITY PERIOD** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*Please see attached Service List*

☑ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☐ (BY OVERNIGHT DELIVERY) By sending by                    to the addressee(s) as indicated on the attached list.

    I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

    Executed on October 2, 2008, at Los Angeles, California.

_____
Mary de Leon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:181779.1

In re Woodside Group, LLC
Case No. 6:08-bk-20682 PC

**Debtor**
Leonard K. Arave
Woodside Group LLC
39 East Eagleridge Drive, Suite 102
N. Salt Lake, UT 84054

Elizabeth Lossing
Offices of the United States Trustee
3685 Main Street, Ste. 300
Riverside, CA 92501
E-mail: Elizabeth.Lossing@usdoj.gov

Attys for Travelers Casualty and Surety Co.
Chad Schexnayder
Jennings, Haug & Cunningham
2800 N. Central Ave., Suite 1800
Phoenix, AZ 85004
E-mail: CLS@jhc-law.com

Attys for Travelers Casualty and Surety Co.
Robert C. Niesley/Kirsten Roe
Watt, Tieder, Hoffar & Fitzgerald, LLC
2040 Main St, Ste. 300
Irvine, CA 92615
E-mail: rniesley@wthf.com

**Parties Requesting Special Notice
By Mail or E-mail**

A Murphy Ranch, LLC
c/o Bruce R. Corbett, Esq.
Corbett, Steelman & Specter
18200 Von Karman Ave., Ste. 900
Irvine, CA 92612-900

A Murphy Ranch, LLC
c/o Richard Whitney
Brookfield Homes
12865 Pointe Del Mar, Ste. 200
Del Mar, CA 92014

A Murphy Ranch, LLC
c/o William Seith
Brookfield Homes
Calif. Customer Care
1522 Brookhollow Dr., Ste. #1
Santa Ana, CA 92705

Counsel to KeyBank National Association
Marc S. Cohen, Esq./Steven F. Werth, Esq.
Kaye Scholer, LLP
1999 Avenue of the Stars, Ste. 1700
Los Angeles, CA 90067
E-mail: marccohen@kayescholer.com

Counsel to Stock Building Supply
Scott E. Blakely, Esq.
Blakeley & Blakeley
1000 Quail Street, Suite 200
Newport Beach, CA 92660
E-mail: seb@bandlaw.com

JP Morgan Chase Bank, N.A.
c/o Donald L. Gaffney, Esq.
Snell & Wilmer LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202

Counsel to Strategic Land Advisors, Inc.
Robert P. Goe, Esq.
Goe & Forsythe, LLP
660 Newport Center Dr., Ste. 320
Newport Beach, CA 92660
E-mail: rgoe@goeforlaw.com

Counsel to Ad Hoc C'tee of Noteholders
Michael a. Sherman, Esq.
Bingham McCutchen LLP
355 South Grand Ave., Ste. 4400
Los Angeles, CA 90071
E-mail: Michael.sherman@bingham.com

Counsel to Bank of America
Alan H. Martin, Esq.
Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626-1993
E-mail: amartin@sheppardmullin.com

Counsel to Griffith Company
Donald E. Bradley/Donna B. Noushkam
Musick, Peeler & Garrett LLP
650 Town Center Dr., Ste. 1200
Costa Mesa, CA 92626
E-mail: d.bradley@mpglaw.com

Counsel for Quip-Con, Inc. and Perrault
Corporation
Jon F. Gauthier
Marks, Golia & Finch, LLP
3900 Harvey Street, 1st Floor
San Diego, CA 92110-2825

Primeshares World Markets, LLC
Primeshares
Attn: RVS
261 Fifth Ave., 22nd Floor
New York, NY 10016
E-mail: ksync@primeshares.com

**Parties Requesting Special Notice via
ECF Notification**

Attorneys for Bank of America
Richard W. Brunette
Sheppard Mullin Richter & Hampton

Kelly C. Griffith, Esq.
Harris Beach, PPLC

Dennis G. Bezanson
Best Best & Krieger, LLP

Franklin C. Adams
Best Best & Krieger, LLP

Curt Todd
Lottner Rubin Fishman Brown & Saul, P.C.

**Creditors Holding 20 Largest Unsecured
Claims**

JP Morgan Chase Bank, NA
Attn: Dept. AZ1-1328
201 North Central Avenue, 14th Floor
Phoenix, AZ 55004

Bank of America
Real Estate Managed Assets
201 E. Washington Street
Phoenix, AZ 85004

Alliance Capital Management Corp.
1345 Avenue of the Americas, 39th Flr.
New York, NY 10105

Metropolitan Life Insurance Company
Investments
10 Park Avenue
P.O. Box 1902
Morristown, NJ 07962

John Hancock Life Insurance Co.
Attn: Isaac Epps
197 Clarendon Street C-2
Boston, MA 02117

The Guardian Life Insurance Company of
America
7 Hanover Square
New York, NY 10004-2616

Wachovia Bank NA
Washcovia Capital Markets, LLC
Attn: Kathy Harkness
301 South College Street, NC0537
Charlotte, NC 28288

ING Investment Management LLC
5780 Powers Ferry Rd. NW #300
Atlanta, GA 30327-4349

Guaranty Bank
Corporate Lending Headquarters
8333 Douglas Avenue
Dallas, TX 75225

Washington Mutual Bank
Corporate Headquarters
1301 Second Avenue
Seattle, WA 98101

US Bank, NA
US Bankcorp Center
800 Nicollet Mall
Minneapolis, MN 55402

Hare & Co.
c/o The Bank of NY
P.O. Box 11203
New York, NY 10286

Keybank NA
Corporate Headquarters
127 Public Square
Cleveland, OH 44144

New York Life Insurance co.
c/o New York Life Investment Mgmt.
51 Madison Ave.
New York, NY 10010

Bank of the West
Real Estate Managed Asset Department
3000 Oak Road, Suite 400
Walnut Creek, CA 94597

Regions Bank (successor by merger to
AmSouth Bank)
Special Assets Dept. – Attn: Carl Ferris
Mail Stop BH10701B
1901 6th Avenue North
Birmingham, AL 35203

Metropolitan Life insurance Company of
Ct.
10 Park Avenue
P.O. Box 1902
Morristown, NJ 07962

Union Bank of California, N.A.
Special Assets Dept. – Attn: Joel Steiner
445 South Figueroa St., 4th Floor
Los Angeles, CA 90071

Wells Fargo Bank NA
Attn: Loan Adjustment Group
MAC U1228-062
299 South Main Street, 6th Floor
Salt Lake City, UT 84111

CUNA Mutual Life Insurance Society
Attn: Managing Director – Investments
5910 Mineral Point Road
Madison, WI 53705

AXA Equitable Life Insurance Co
Neville Hemmings
1290 Ave of the Americas 12th Fl
New York, NY 10104

Bingham McCutchen LLP
Michael Reilly Esq & Mark W Deveno Esq
399 Park Ave
New York, NY 10022-4689
michael.reilly@bingham.com;
mark.deveno@bingham.com

Himefish Co
c/o State Street Bank and Trust
PO Box 5756
Boston, MA 02206

Snell & Wilmer LLP
Michael B Reynolds & Eric S Pezold
600 Anton Blvd Ste 1400
Costa Mesa, CA 92626
mreynolds@swlaw.com;
epezold@swlaw.com

John Hancock Life Insurance Co
General Account
John Hancock Pl
200 Clarendon St
Boston, MA 02117

John Hancock Life Insurance Company
USA
John Hancock Pl
200 Clarendon St
Boston, MA 02117

John Hancock Variable Life Insurance Co
John Hancock Life Insurance Company
Bond and Corporate Finance Group
197 Clarendon St
Boston, MA 02117

JPMorgan Chase
Outsourcing Dept
4 New York Plaza
11th Fl Dept 6583
New York, NY 10004

Manulife Insurance Company
fka Investors Partner Life Insurance
Company
John Hancock Pl
200 Clarendon St
Boston, MA 02117

Metropolitan Life Insurance Company
1 MetLife Plaza
27 01 Queens Plaza North
Long Island City, NY 11101

National Benefit Life Insurance Co
Attn Private Placements 7th Fl
242 Trumbull St
Hartford, CT 06115-0449

Brian O'Connor
First Bank

New England Life Insurance Company
c/o Metropolitan Life Insurance Company
1 MetLife Plaza
27 01 Queens Plaza North
Long Island City, NY 11101

Ohio National Life Assurance Corporation
Attn Investment Dept
PO Box 237
Cincinnati, OH 45201

Primerica Life Insurance Company
Attn Private Placements 7th Fl
242 Trumbull St
Hartford, CT 06115-0449

Riverside County Treasurer
PO Box 12005
Riverside, CA 92502-2205

Security Financial Life Insurance Co
4000 Pine Lake Rd
PO Box 82248
Lincoln, NE 68501-2248

Security Life of Denver Insurance Company
Mike Lisenby
c/o ING Investment Management LLC
5780 Powers Ferry Rd NW Ste 300
Atlanta, GA 30327-4349

State of California
Thomas P O'Brien
3880 Lemon St Ste 210
Riverside, CA 92501

The Ohio National Life Insurance Company
Attn Investment Dept
One Financial Way
Cincinnati, OH 45242

The Ohio National Life Insurance Company
Attn Investment Dept
PO Box 237
Cincinnati, OH 45201

The Travelers Insurance Company
Attn Private Placements 7th Fl
242 Trumbull St
PO Box 150449
Hartford, CT 06115-0449

The Travelers Insurance Company
c/o Metropolitan Life Ins Co
10 Park Ave
PO Box 1902
Morristown, NJ 07962

Comerica Bank
Cynthia B Jones
500 Woodward Ave 4th Fl
Detroit, ,MI 48226

Compass Bank
Corporate Headquarters
15 South 20th St
Birmingham, AL 35233

Suntrust Bank
Corporate Headquarters
303 Peachtree St NE
Atlanta, GA 30308

First Commercial Bank
New York Agency
750 3rd Ave 34th Floor
New York, NY 10017

Callister Nebeker & McCullough
Jeffery L Shields Esq
Zions Bank Building Ste 900
10 East South Temple
Salt Lake City, UT 84133
jlshields@cnmlaw.com

Pillsbury Winthrop Shaw Pittman LLP
Mark D Houle Esq
650 Town Center Dr Ste 700
Costa Mesa, CA 92626-7122
mark.houle@pillsburylaw.com

Bingham McCutchen LLP
Jonathan B Alter
One State St
Hartford, CT 06103-3178
jonathan.alter@bingham.com

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

Securities and Exchange Commission
5670 Wilshire Blvd 11th Fl
Los Angeles, CA 90036

United States Department of Justice
Attorney General
Ben Franklin Station
PO Box 683
Washington, DC 20044

United States Attorneys Office
Civil Process Clerk
Federal Building Room 7516
300 North Los Angeles St
Los Angeles, CA 90012

Acacia Bank
Rob Jacobs
7600 Leesburg Pike East Building Ste 200
Falls Church, VA 22043

AKT Investments
Mark Enes
7700 College Town Dr Ste 101
Sacramento, CA 95826

Alameda Investments LLC
Leonard K Arave
39 E Eagleridge Dr Ste 102
N Salt Lake, UT 84054

Ballard Spahr Andrews & Ingersoll LLP
Richard Perelman
1735 Market St
Philadelphia, PA 19103-7599

Bank of America NA
Ronald V Montoro Senior VP
450 B Street Ste 620
San Diego, CA 92101

Beazer Holdings Corp
Bill June President
9121 West Russell Road Ste 200
Las Vegas, NV 89148

Beretta Property Management / VINTACO
David Beretta Director of Real Estate
39560 Stevenson Place Ste 118
Freemont, CA 94539

Bilzin Sumberg Baena Price & Axelrod
Brian Bilzin
2500 Wachovia Financial Center
Miami, FL 33131

Brookfield Homes
Richard T Whitney
12865 Pointe Del Mar Ste 200
Del Mar, CA 92014

Brookfield Homes Corporation
Dennis J Chapman
1522 Brookhollow Dr Ste 1
Santa Ana, CA 92705

Coleman-Toll Limited Partnership
Gary Mayo VP
1140 Town Center Dr Ste 350
Las Vegas, NV 89144

Daro Ventures LLC
Dale Francescon
Robert J Francescon
5975 Greenwood Plaza Blvd Ste 105
Greenwood Village, CO 80111

Focus Property Group
I Scott Bogatz General Counsel
3455 Cliff Shadows Pkwy Ste 220
Las Vegas, NV 89129

Holland & Knight LLP
John R Nyweide
131 S Dearborn St 30th Fl
Chicago, IL 60603

JPMorgan Chase Bank NA
John McDonagh
277 Park Ave 8th Fl
New York, NY 10172

KB Home
Tony Richelieu
10990 Wilshire Blvd 7th Fl
Los Angeles, CA 90024

KB Home Nevada Inc
James Widner
5644 Badura Ave
Las Vegas, NV 89118

Kimball Hill Homes of Nevada Inc
Gary Kazio VP Community Development
8965 South Eastern Ave Ste 200
Las Vegas, NV 89183

Lennar Communities Nevada LLC
Edward Gierman
25 Enterprise
Aliso Viejo, CA 92656

Colemant-Toll Bros Inc
Gary Mayo VP
1140 Town Center Dr Ste 350
Las Vegas, NV 89144

Amy Klarer VP Appraisal Review
11901 Olive Blvd
Creve Coeur, MO 63141

Focus South Group LLC
John Ritter
3455 Cliff Shadows Pkwy Ste 220
Las Vegas, NV 89189

Honigman Miller Schwartz and Cohn LLP
Thomas E Przybylski
2290 First National Bldg
660 Woodward Ave
Detroit, MI 48226-3506

KB Home
Christopher Stephens
5655 Badura Ave
Las Vegas, NV  89118

KB Home
William R Hollinger
10990 Wilshire Blvd 7th Fl
Los Angeles, CA 90024

KB Homes Nevada Inc
Don Delgiorno Division President
5655 Badura Ave
Las Vegas, NV 89118

Kimball Hill Inc
Hal H Barber
5999 New Wilke Rd Ste 504
Rolling Meadows, IL 60008

Kummer Kaempfer Bonner & Renshaw
John C Jeppsen
3800 Howard Hughes Pkwy Seventh Fl
Las Vegas, NV 89109

Lennar Communities of Nevada LLC
Jeremy Parness Division President
2920 N Green Valley Pkwy Ste 811
Henderson, NV 89014

Comerica Bank
David J Lardner Senior VP
455 Capitol Mall Ste 310
MC 4202
Sacramento, CA 95814

Focus / Kyle Acquisition Group LLC
John Ritter
3455 Cliff Shadows Pkwy Ste 220
Las Vegas, NV 89189

Guarontor
Christo D Bardis
10630 Mather Blvd
Sacramento, CA 95655

JAS Development / Sioukas Investments
Dean Sioukas
2277 Fairoaks Blvd Ste 295
Sacramento, CA 95825

KB Home
Kelly M Allred
10990 Wilshire Blvd 7th Fl
Los Angeles, CA 90024

KB Home Nevada Inc
James Widner
5655 Badura Ave
Las Vegas, NV 89118

Kimball Hill Homes Nevada Inc
Stan Gutshall
8 Sunset Way Ste 101
Henderson , NV 89014

Kimball Hills Homes of Nevada Inc
Stan Gutshall
8 Sunset Way Ste 101
Henderson, NV 89014

Lennar
Dustin Barker VP Finance
10345 Professional Circle Ste 100
Reno, NV 89521

Lennar Corporation
Edward Gierman
25 Enterprise
Aliso Viejo, CA 92656

Lennar Corporation
Treasury
25 Enterprise
Aliso Viejo, CA 92656

Lennar Reno LLC
Larry Gualco
10345 Professional Circle Ste 100
Reno, NV 89521

LW D'Andrea LLC
Joy Condon
25 Enterprise
Aliso Viejo, CA 92656

Meritage Homes Corporation
Larry W Seay
8501 E Princess Dr Ste 290
Scottsdale, AZ 85255

Meritage Homes of Nevada
Robb Beville Division President
5555 West Badura Ave Ste 120
Las Vegas, NV 89118

Morrison & Foerster LLP
Thoma R Fileti
555 W Fifth St
Los Angeles, CA 90013-1024

MTH-Homes Nevada Inc
Robert M Beville
555 Went Badura Ave Ste 120
Las Vegas, NV 89118

Pardee Homes of Nevada
Klif Andrews Division President
650 White Dr Ste 100
Las Vegas, NV 89119

PN II Inc
Bruce E Robinson
100 Bloomfield Hill Pkwy No 300
Bloomfield Hills, MI 48304

PN II Inc
John Cahlan
1635 Village Center Circle Ste 250
Las Vegas, NV 89134

Premier Homes
Kevin Yttrup
8205 Sierra College Blvd Ste 100
Roseville, CA 95661

Pulte Homes Inc
Bruce E Robinson
100 Bloomfield Hill Pkwy No 300
Bloomfield Hills, MI 48304

Reyen & Bardis (Placer 356) LP
John Reynen
9848 Business Park Dr Ste H
Sacramento CA 95827

Rice Silbey Reuther & Sullivan
Renee R Reuther
3960 Howard Hughes Pkwy Ste 700
Las Vegas, NV 89109

Rice Silbey Reuther & Sullivan LLP
Stephen M Sullivan
3960 Howard Hughes Pkwy Ste 700
Las Vegas, NV 89109

River West Investments Inc
Brian Vail
3001 "I" Street Ste 200
Sacramento, CA 95816

Ryland Homes Nevada LLC
Cathey S Lowe
24025 Park Sorrento Ste 400
Calabasas, CA 91302

Sacramento Valley View
Eric Gragg
12401 Folsom Blvd Ste 303
Rancho Cordova, CA 95742

Shulz Ranch Developers LLC
Joy Condon
25 Enterprise
Aliso Viejo, CA 92656

Simpson Thacher & Barlett LLP
Peter V Pantaleo
425 Lexington Ave 12th Fl
New York, NY 10017

SKK Developments
Sotiris K Kolokotronis
730 Alhambra Blvd Ste 222
Sacramento, CA 95816

Slenker Communities
William Slenker
6225 Brandon Ave Ste 260
Springfield, VA 22150

Standard Pacific Corp
August Belmont
255 East Rincon Street Ste 200
Corona, CA 92879

Standard Pacific Homes
Jon Nicholson
2240 Douglas Boulevard Ste 200
Roseville, CA 95661

The Ryland Group Inc
Cathey S Lowe
24025 Park Sorrento Ste 400
Calabasas, CA 91302

The Ryland Group Inc
Timothy J Geckle
24025 Park Sorrento Ste 400
Calabasas , CA 91302

Toll Brothers Inc
Ann Marie Mitchell
250 Gibraltar Rd
Horsham, PA 19044

Toll Brothers Inc
Mark J Warshauer VP
250 Gibraltar Rd
Horsham, PA 19044

Union Bank of California
Joel Steiner VP
445 South Figueroa St
Los Angeles, CA 90071

US Bank National Association
Michelle Pearce VP
170 South Main Ste 600
Salt Lake City, UT 84101

Wachovia Bank NA / Real Estate Financial
Services
Elena Bennett Senior VP
18300 Von Karman Ave Ste 450
Irvine, CA 92612

Wachovia Bank Nation Association
C Mark Hedrick
301 South Tryon St
Charlotte, NC 28288

Wayne Farnsworth
39 E Eagleridge Dr Ste 102
N Salt Lake, UT 84054

Woodside Group Inc
Leonard K Arave
39 E Eagleridge Dr Ste 102
N Salt Lake, UT 84054

Woodside R&B 356 LP
John Reynen
9848 Business Park Dr Ste H
Sacramento, CA 95827

American Equity Investment Life Insurance
5000 Westown Pkwy Ste 440
West De Moines, IA 50266

American Family Life Insurance Co
6000 American Pkwy
Madison, WI 53783

Assurity Life Insurance Company
4000 Pine Lake Rd
Lincoln, NE 68516

Chimefish Company
c/o State St Bank & Trust
Box 5756
Boston, MA 02206

CUMIS Insurance Society
c/o CUMIS Mutual Ins Society
Attn Managing Director Investments
5910 Mineral Point Rd
Madison, WI 53705

Invester Partner Life
200 Clarendon St
Boston, MA 02117

Invester Partner Life Insurance Co
200 Clarendon St
Boston, MA 02117

John Hancock Life Insurance Company
197 Clarendon St C 2
Boston, MA 02117

John Hancock Life Insurance Company
USA
197 Clarendon St C 2
Boston, MA 02117

John Hancock Life Variable Insurance Co
197 Clarendon St C 2
Boston, MA 02117

John Hancock Variable Life
197 Clarendon St C 2
Boston, MA 02117

JP Morgan Securities
270 Park Ave
New York, NY 10017

Members Life Insurance Company
5910 Mineral Point Rd
Madison, WI 53705

Met Life and Annuity Company of Ct
10 Park Ave
PO Box 1902
Morristown, NJ 07962

National Benefit Life Insurance Company
One Financial Plaza 13th Fl
Hartford, CT
06103

Nationwide Annuity
One Nationwide Plaza
Columbus, OH 43215

Nationwide Life
One Nationwide Plaza
Columbus, OH 43215

Nationwide Life Insurance Company
One Nationwide Plaza
Columbus, OH 43215

Nationwide Life Insurance Company Life
and Annuity
One Nationwide Plaza
Columbus, OH 43215

Nationwide Life of America
One Nationwide Plaza
Columbus, OH 43215

Nationwide Multiple
One Nationwide Plaza
Columbus, OH 43215

Nationwide Mutual
One Nationwide Plaza
Columbus, OH 43215

New York Life Insurance & Annuity Corp
51 Madison Ave
New York, NY 10010

Ohio National
One Financial Way
Cincinnati, OH 45202

Ohio National Life
One Financial Way
Cincinnati, OH 45202

Ohio National Life Assurance Corporation
One Financial Way
Cincinnati, OH 45202

Primerica
One Financial Plaza 13th Floor
Hartford, CT 06103

Scottsdale Insurance Company
One Nationwide Plaza
Columbus, OH 43215

TCI-MGA10 Park Ave
PO Box 1902
Morristown, NJ 07962

TLAC-MGA10 Park Ave
PO Box 1902
Morristown, NJ 07962

Travelers Insurance Company
10 Park Ave
PO Box 1902
Morristown, NJ 07962

State of California Employment
Development Department
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA 94280-0001

State of California Franchise Tax Board
Attn Bankruptcy
PO Box 2952
Sacramento, CA 95812-2952

JP Morgan Chase Bank NA Admin Agent
Attn Jerri Hunt
80 W Broadway
Executive Offices UT1 7600
Salt Lake City, UT 84101

Adams Bros Interiors of Nevada
PO Box 51916 Unit A
Los Angeles. CA 90051-6216
gtorchia@clopay.com

Bair's Carpet Valley Inc
7465 W Sunset Rd Ste 1200
Las Vegas, NV 89113
llundmark@isidc.com

Banker Insulation
4730 Cecile Ave
Las Vegas, NV 89115

BD Trim Co Inc
6270 Kimberly Ave Ste B
Las Vegas, NV 89122

Cabinet West Distributors
150 Cassia Way No 100
Henderson, NV 89014

Creative Touch Interiors Inc
6480 Cameron St Ste 303
Las Vegas, NV 89118
rob_talkington@ctihome.com

Floors by Design Inc
2043 West Lone Cactus Dr
Phoenix, AZ 85027-6832
teresastewart@floorsbydesign.biz

H & M Roofing Inc CNW
3189 Fitzgerald Rd
Rancho Cordova, CA 95742

Houston Stafford Electric
451 Mark Leany Dr
Henderson, NV 89015

Integrity Wall Systems LLC
1012 Sharp Circle
North Las Vegas, NV 89030

Interior Specialists Inc
7465 W Sunset Rd Ste 1200
Las Vegas, NV 89113

Interstate Plumbing & Air Conditioning
7201 W Post Rd
Las Vegas, NV 89113
andy@ipair.com

Jim Crawford Construction Co., Inc CFW
1189 Holbitt Ave
Clovis, CA 93612

K Bell Plumbing
3476 W 4600 South
West Haven, UT 84401
kevin@kbell.biz
terry@kbell.biz
marilyn@kbell.biz

KBI Construction LLC
4339 Corporate Center Dr Ste 108
North Las Vegas, NV 89030

Lake Las Vegas Properties LLC
1605 Lake Las Vegas Pkwy
Henderson, NV 89011

Landscape Services Inc
PO Box 270698
Las Vegas, NV 89106-0698
702-386-5477
702-2515972
brian.mcbride@landserv.com

Las Vegas Rock Inc
PO Box 19118
Jean, NV 89019
702-791-7625
702-896-4533

Lunas Construction Clean Up
4830 E Cartier Ave
Las Vegas, NV 891155

M G Building Materials
2651 SW Military Dr
San Antonio, TX 78224
mpalacios@mgbuildingmaterials.com

MCH Electric Inc (CBW)
31084 S Hwy 33
Tracy, CA 95304

.

Red Rock Insulation
5810 S Wynn Rd
Las Vegas, NV 891183

Roadrunner Drywall – NEVADA
4025 East Post Rd
Las Vegas, NV 89120

SelectBuild Nevada Inc (Windows)
4339 Corporate Center Dr No 108
North Las Vegas, NV 89030

Three G Construction
1820 E Deer Valley Rd
Phoenix, AZ 85024
woodside.starts@3-gconstruction.com

Zions First National Bank
Doug Gray
1 South Main Ste 1340
Salt Lake City, UT 84118

Zions First National Bank
Jared Geisler
310 South Main St 14th Fl
Salt Lake City, UT 84101
jared.geisler@zionsbank.com