1  BINGHAM MCCUTCHEN LLP
   Michael J. Reilly (Admitted Pro Hac Vice)
2  Jonathan B. Alter (Admitted Pro Hac Vice)
   Mark W. Deveno (Admitted Pro Hac Vice)
3  One State Street
   Hartford, CT  06103-3178
4  Telephone:  860.240.2700
   Facsimile:  860.240.2800
5  Email: michael.reilly@bingham.com
          jonathan.alter@bingham.com
6         mark.deveno@bingham.com

7  Counsel to Ad Hoc Group of Noteholders

8              UNITED STATES BANKRUPTCY COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10                  RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>WOODSIDE GROUP, LLC, et al.,[1]<br><br>Debtors.<br><br>☒     Affects  ALL DEBTORS | Chapter 11<br>6:08-bk-20682-PC (Jointly Administered)<br><br>**REPLY OF THE NOTEHOLDERS TO:**<br><br>**(A) DEBTORS' OPPOSITION TO NOTEHOLDERS' MOTION FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, OR, ALTERNATIVELY, DIRECTING BOTH (I) THE APPOINTMENT OF AN EXAMINER FOR CERTAIN SPECIFIED PURPOSES AND (II) THE TERMINATION OF THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE AND CONFIRM A PLAN (THE "TRUSTEE MOTION"); AND**<br><br>**(B) STATEMENT OF POSITION OF ZIONS FIRST NATIONAL BANK REGARDING THE TRUSTEE MOTION**<br><br>Hrg. Date:   October 23, 2008 at 10:30 a.m.<br>Place:         Courtroom 304<br>                    United States Bankruptcy Court<br>                    3420 Twelfth Street<br>                    Riverside, CA  92501<br><br>Judge:         Honorable Peter H. Carroll |

---

[1]  See Notice Identifying Jointly Administered Debtors setting forth all debtors and debtors in possession in these jointly administered cases and their respective tax identification numbers (Docket No. 32).


TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ..................................................................................... 1

II. ARGUMENT .................................................................................................................... 2

    A. The Debtors Were Harmed by the Tax Reorganization ........................................ 2

        The Equity Holders Were the Only Beneficiaries of the Tax Reorganization ................................................................................................. 2

        The Built in Loss was a Valuable Asset of the Debtors ........................... 5

        The Debtors' Opposition Contains an Inherent Recognition of This Potential Harm ........................................................................................... 7

        The Debtors' Senior Managers Acknowledge That They Failed to Consider Other Alternatives By Which the Debtors Could Use the Built in Loss ................................................................................... 9

    B. The Debtors Were Harmed by the Zions Related Transfers ............................. 10

        The Grant of Liens to Zions Bank Raises Questions Regarding the Debtors' Judgment ................................................................................... 10

        The Transfer of Assets From the Debtors to the Zions Borrowers, Likewise, Raises Questionable Judgment ................................................ 12

    C. Correcting Certain Factual Mischaracterizations Set Forth in the Opposition ........................................................................................................... 12

III. CONCLUSION ............................................................................................................... 15

A/72676093.5/3007791-0000330152

# TABLE OF AUTHORITIES

Page

**STATUTES**

11 U.S.C. § 105 .................................................................................................................... 15

11 U.S.C. § 1104 .................................................................................................................. 15

11 U.S.C. § 1121 .................................................................................................................. 15

26 U.S.C. § 56 ....................................................................................................................... 8

26 U.S.C. § 108 ................................................................................................................. 6, 7

26 U.S.C. § 382 ..................................................................................................................... 8

26 U.S.C. § 1361 ................................................................................................................... 6

**OTHER AUTHORITIES**

Joffe Declaration ................................................................................................................ 3, 7

Arave Deposition .......................................................................................... 4, 5, 9, 10, 11, 15

Nilson Deposition ................................................................................................. 4, 9, 14, 15

Koutouras Deposition .......................................................................................................... 8

The Ad Hoc Group of Noteholders (the "Noteholders") of the above captioned debtors (the "Debtors") hereby reply to (i) the Debtors' opposition (the "Opposition") to the Noteholders' Motion for entry of an order directing the appointment of a chapter 11 trustee or, alternatively, directing both (A) the appointment of an examiner for certain specified purposes and (B) the termination of the Debtors' exclusive periods in which to file and confirm a plan of reorganization (the "Trustee Motion"), and (ii) the statement of position of Zions First National Bank regarding the Trustee Motion (the "Zions' Statement"). In support of the Trustee Motion and this reply, the Noteholders respectfully represent as follows.[2]

## I. Preliminary Statement

1.      With each statement made and each position taken by the Debtors, including the filing of pleadings in these cases, the need for a chapter 11 trustee becomes more apparent. The Opposition serves to highlight this point. Riddled with factual mischaracterizations that are belied by the Debtors' own deposition testimony, the Opposition serves to raise further questions about the credibility of those running the Debtors' affairs. Moreover, the Opposition reveals that the Debtors' senior managers simply do not understand the issues that are most critical to the Trustee Motion -- the Tax Reorganization and the Zions related transfers.

2.      Putting aside the factual mischaracterizations set forth in the Opposition, the Debtors appear to assert one common theme as to why the Debtors' senior managers should remain in control -- *no harm, no foul*." While this is certainly not the appropriate standard for assessing management's conduct, in actuality, there has been extensive harm, and the Debtors' conduct has indeed been foul.

---

[2]  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Trustee Motion.

1

3.  In response to the Opposition, this Reply highlights a few simple points:

- The Debtors have been harmed by the Tax Reorganization;

- The Debtors have been harmed by the transfer of assets to the Zions' Borrowers; and

- The Debtors have been harmed, not just by inadvertence, but as a result of decisions by the Debtors' senior managers to pursue their own conflicted self interests.

4.  For all of these reasons as well as those set forth in the Trustee Motion, the appointment of a chapter 11 trustee is warranted.[3]  In addition, as more fully set forth below, the willingness of the Debtors to boldly mischaracterize in their Opposition certain facts and circumstances leading to the filing of these bankruptcy cases serves to further erode creditor confidence, and to further highlight the need for an independent fiduciary.

## II.  Argument

**A.   The Debtors Were Harmed by the Tax Reorganization**

**The Equity Holders Were the Only Beneficiaries of the Tax Reorganization[4]**

5.  At its core, the Tax Reorganization was a vehicle for making use of the difference between the high basis in the Debtors' existing assets and the low fair market value of those

---

[3] Appointment of a trustee is appropriate under the circumstances, and, in fact, the only adequate means by which to ensure the preservation of estate assets and the prompt facilitation of a productive plan process.  In the event that the Court determines not to appoint a chapter 11 trustee, the Noteholders request the alternative relief necessary to level the playing field between the parties.  As more fully set forth in the Trustee Motion, the Noteholders believe such relief should include the appointment of an examiner as well a termination of the Debtors' exclusive periods in which to file and confirm a Plan of Reorganization.

[4] For ease of reading, this reply will often refer to tax pass through entities and the ability of the Equity Holders to receive tax refunds based on corporate losses.  For the avoidance of doubt, as stated in the Trustee Motion, the Noteholders reserve all rights with respect to the proper characterization of such refunds (for instance, as to whether such refunds are property of the estate or whether they can be recovered by the estates based on avoidance theories).

2

assets (the "<u>Built in Loss</u>").[5] According to the E&Y Presentation, the Built in Loss applicable to the Debtors' assets was approximately $500 million.[6] Ordinarily, that Built in Loss would be recognized from a tax perspective only upon the disposition of assets -- that is, the Debtors would recognize a portion of the Built in Loss with each sale of an asset over time. By means of the Tax Reorganization, the Debtors accelerated recognition of the Built in Loss on all assets via a paper transaction. In turn, the acceleration and recognition of the Built in Loss served to *extinguish* the Built in Loss -- i.e., the Debtors' remaining basis in assets was written down by approximately $500 million. Declaration of Steven Joffe ¶ 5 (the "<u>Joffe Declaration</u>", a copy of which is filed herewith as <u>Exhibit A</u>).[7]

      6.    At the time of consummation of the Tax Reorganization, the Debtors were structured as "pass through" entities for tax purposes. As a result, the "recognized" $500 million Built in Loss passed through to the benefit of the Equity Holders. As discussed in the Trustee Motion, and as acknowledged by the Opposition, the Equity Holders intend to apply such losses against prior years' income in order to seek significant tax refunds for their own personal benefit. Joffe Declaration ¶ 6.

---

[5] The Debtors' own tax analysis -- the E&Y Presentation -- describes the purpose of the Tax Reorganization as follows: "[t]o convert Woodside Group Inc. (an S-corporation) into a limited liability company, which will trigger ordinary loss, in the S-corporation, *due to high-basis, low value assets* that will be completely liquidated to the shareholders." (emphasis added).

[6] *See also* Deposition of Leonard Arave, October 7, 2008 at page 27, lines 5-14 (estimating the tax loss to be somewhere between $400 million and $500 million).

[7] The Opposition asserts that the Trustee Motion lacks "evidence" of harm to the Debtors from the Tax Reorganization. As set forth in the Trustee Motion and this Reply, the harm to the Debtors stems from a reduction in basis. That fact is clearly in the record. What the Debtors might have done with that high basis is legal in nature and described in both the Trustee Motion and this Reply. Nonetheless, in an abundance of caution, the Joffe Declaration is provided in further support of this Reply.

7. Importantly, no Equity Holder has agreed to remit any tax refunds stemming from the Tax Reorganization to the Debtors, and the Debtors did not pre-condition the Tax Reorganization on such terms. The deposition testimony of Ezra Nilson highlights this fact:

> Q. Do you have any commitments of any kind from any shareholders to use the tax refunds for any corporate purpose?
>
> A. No.
>
> Q. Have you engaged in any negotiations or discussions with any shareholder regarding the use of tax refunds for corporate purposes?
>
> A. No

*See* Deposition of Ezra Nilson, October 6, 2008 at page 60, lines 23-25 and page 61, lines 1-5 (hereafter, the "Nilson Deposition"); *see also* Deposition of Leonard Arave, October 7, 2008 at page 69, lines 21-24 (hereafter, the "Arave Deposition"). Copies of the Nilson Deposition and the Arave Deposition have been filed herewith as Exhibits B and C, respectively.[8]

8. Because the Debtors have no agreement from the Equity Holders to remit tax refunds to the Debtors, the Tax Reorganization results in no cognizable benefit to the Debtors.[9]

---

[8] Exhibits to all deposition transcripts filed herewith can be made available upon request.

[9] The Opposition attempts to assert that there were valid corporate reasons for the Tax Reorganization, such as a need to convert from Subchapter S status to a more flexible status so as to accommodate outside investment. This argument is belied by Mr. Nilson's deposition testimony:

> Q. Do you have any commitment from anyone to provide an equity investment in the Woodside Group?
> A. No.
> Q. Have you engaged in any discussions over the last year with anyone regarding potential equity investments in the Woodside Groups? . . .
> A. We'll, we -- we went through a process. We hired FBR and for a time had J.P. Morgan as a co-manager trying to find equity money to put into the company. *We, in the last analysis, never did get anyone's interest* to the point that they were willing to do that. . . .

Nilson Deposition at page 61, lines 23-25 and page 62, lines 1-3, lines 6-12. Additionally, the Opposition asserts that conversion to an LLC and merger of various subsidiaries might have provided administrative benefits in terms of operating the Debtors' businesses. Mr. Arave's deposition testimony, however, reveals that the Debtors had considered a reorganization for years for this very purpose, but decided the benefits were not worth the *tax harm that would have been imposed on the Equity Holders* by such a conversion in prior years. Arave Deposition at 123, lines 23-25 and page 124, lines 1-11. Unfortunately, as will be shown herein, the Tax Reorganization resulted in significant harm to the Debtors. Why then were the managers, over a period of

As a result, if there is any way in which the *Debtors* -- not the Equity Holders -- could have used the Built in Loss to their advantage, then the elimination of the Built in Loss, via the Tax Reorganization, was indeed detrimental to the Debtors.

**The Built in Loss was a Valuable Asset of the Debtors**

9.     At all times while considering the Tax Reorganization, the Debtors were also considering potential bankruptcy filings.[10]  For that matter, if the Debtors were to avoid bankruptcy filings, they needed to complete a restructuring with the Noteholders and the Bank Lenders in order to do so.  In either case, the Noteholders and the Bank Lenders (as well as other creditors) had the potential to become holders of some portion of the Debtors' equity -- and thus had the potential to become beneficiaries of any value possessed by the Debtors in the Built in Loss.

10.     Let's consider a simple example of how the Debtors might have used the Built in Loss to the *Debtors'* benefit -- rather than to the benefit of existing Equity Holders.  For this example, we'll presume as follows:[11]

- The Tax Reorganization did not occur.  Woodside Group remained a Subchapter S corporation;

---

years, able to so readily defer the Tax Reorganization because of concerns for the Equity Holders' well-being, but completely unable to analyze the Debtors' well-being when consummating the Tax Reorganization in 2008?  It is not surprising that these rationales do not ring true.  This is because, as stated in the Trustee Motion, the only credible rationale for consummation of the Tax Reorganization was to accelerate the recognition of the Built in Loss for the individual benefit of self interested Equity Holders.

[10]    *See* Arave Deposition at page 90, lines 9-25; page 91, lines 1-15 and page 108, lines 15-20.

[11]    For the avoidance of doubt, the example provided herein is offered for illustrative purposes only.  The example is not intended to suggest a Noteholder view on acceptable settlement terms, estate valuation or other matters.  It is simply offered to illustrate that, prior to completing the Tax Reorganization, there were indeed scenarios that the Debtors could have considered for purposes of making use of the Built in Loss (rather than simply handing the value of the Built in Loss to the Equity Holders).

To be clear, preservation of losses via a bankruptcy plan of reorganization is an arduous process.  Restructuring terms would need to be developed and the tax advisors would need to work carefully to consider the myriad issues relevant to preservation of basis.  This can often be a significant portion of the plan development process.  That said, the example provided herein highlights clearly that it is possible to preserve basis in certain circumstances, and that the Tax Reorganization stripped the Debtors' constituents of the opportunity to consider and analyze such issues.

- Woodside Group and the other Debtors filed voluntary bankruptcy petitions;
- For this example, we'll presume the Noteholders and the Bank Lenders to hold an aggregate amount of debt equal to $700 million;
- For this example, we'll presume that, via a Plan of Reorganization, the following terms were reached:
  - It was determined that the Debtors could support $500 million of the $700 million of long term debt. Accordingly, the Plan provided for the establishment of new long term notes to repay $500 million to the Noteholders and the Bank Lenders;
  - In order to simplify this example, we'll presume the Noteholders and the Bank Lenders agreed to take less than equivalent treatment, such that the Plan permitted all other unsecured creditors (e.g., trade creditors) to be paid in full or otherwise paid in the ordinary course;
  - In return for the give-up of $200 million in claim value, the Plan provided that the Noteholders and the Bank Lenders would acquire a 40% equity interest in the Debtors (specifically, in Woodside Group and Pleasant Hill, which, as so reorganized, will be referred to herein as "Reorganized Woodside"). We'll presume that the Noteholders and the Bank Lenders either voluntarily took less than 100% of the equity interests in Reorganized Woodside or that the old Equity Holders contributed new value to support their retention of a 60% stake. We'll also presume that prior to issuing the reorganized equity, the various subsidiaries of Woodside Group were converted to limited liability companies in order to preserve their tax pass-through nature and push all tax consequences to the Woodside Group level.

11. From a tax perspective, the impact of the above restructuring would be as follows. Woodside Group would be converted to a regular C corporation upon the issuance of equity to the Noteholders and the Bank Lenders.[12] Woodside Group would therefore cease to be a tax pass through entity. Woodside Group would have cancellation of indebtedness of $200 million.[13] Notwithstanding that cancellation of indebtedness, due to Woodside Group's bankruptcy, Woodside Group would not recognize income from that cancellation.[14] Rather, the tax basis in Reorganized Woodside's assets would be reduced by the cancellation of

---

[12] *See* 26 U.S.C. § 1361(b)(1)(B).

[13] *See* 26 U.S.C. § 108(b)(8). In actuality, the cancellation of indebtedness might be less than $200 million if there were a value assigned to the reorganized equity interests that were received in return for the converted debt. To keep this example simple, we will presume the reorganized equity value to be nominal.

6

indebtedness of $200 million.[15] But this reduction would pale in comparison to the $500 million in basis reduction that flowed from the Tax Reorganization. Thus, Reorganized Woodside would have preserved an additional $300 million in asset basis (i.e., it would have preserved a significant portion of the Built in Loss).[16] Joffe Declaration ¶ 7.

12. This preservation of $300 million of basis would undoubtedly be a valuable corporate asset. Following the restructuring, Reorganized Woodside would be able to sell assets in the ordinary course and, in doing so, would be much less likely to recognize taxable gain due to its high basis in assets. In turn, Reorganized Woodside would retain for itself a greater share of cash generated from future sales because it would be less likely to recognize taxable gains thereon. This cash would, of course, run directly to the benefit of Reorganized Woodside and its constituents. Joffe Declaration ¶ 8.

**The Debtors' Opposition Contains an Inherent
Recognition of This Potential Harm**

13. Hidden within the Opposition is a recognition of exactly the type of harm described above. Specifically, the Debtors purport to circumvent the issue by arguing as follows:

> [T]he tax basis of the assets cannot be written down lower than the amount of the debt. This creates two scenarios: (1) if the assets ultimately sell for <u>less</u> than the written down basis, then there is no gain, no tax and no detriment arising from the [Tax Reorganization]; or (2) if the assets are sold for <u>more</u> than the basis, *i.e.*, for more than the Debtors' debt, then *by definition* the Debtors are solvent and such gains will only increase the members' equity, and since Woodside LLC is a pass through entity, the members (who are in the money if the new tax basis is correct) will be responsible for the tax liability.

14. This argument, however, does not withstand scrutiny, as it vastly over-simplifies the present situation. In particular, the argument purports to squeeze the full contours of

---

[14] *See* 26 U.S.C. §108(a)(i)(A).

[15] *See* 26 U.S.C. § 108(b)(2)(E).

[16] The change in status from a Subchapter S corporation to a regular C corporation (without a corresponding change in ownership of more than 50%) will not, in itself, change the tax basis of assets in Woodside Group.

bankruptcy valuation analysis within the simple statement that the existing Equity Holders must be in the money if the Debtors' assets ultimately sell for more than the value of the debt. This assumption is fundamentally flawed. The Debtors are an operating business in the homebuilding industry. Their assets (many of which are presently unfinished lots) can take years to develop and sell in order to maximize their full potential. It is distinctly possible that <u>today</u> those assets are worth very little, the Debtors are unable to support their existing debt and the Equity Holders, therefore, find themselves out of the money when it comes to forming a bankruptcy plan of reorganization. Presuming this to be the case, there's nothing that prevents those creditors that ultimately take equity in the reorganized debtors from, for instance, turning the reorganized debtors into a land holding bank, waiting for the market to rebound, and ultimately selling the assets at a value above the basis that exists in those assets today (i.e., above the value of the debt). Contrary to the Debtors' assertions, this would result in an ultimate sale of assets at an amount exceeding the debt, but would not dictate solvency and would not dictate that the existing Equity Holders be permitted to retain their equity interests. Unfortunately for creditors taking any such reorganized equity, the Debtors (via the Tax Reorganization) have already been deprived of their high basis in assets, and, thus, will be much more likely to recognize taxable gains on future sales.[17]

---

*See* 26 U.S.C. § 382(a) and (g); *see also* 26 U.S.C. § 56(g)(4)(G).

[17] The over-simplification of this issue, as presented in the Opposition, may be explained by the evidence the Debtors present. In support of their Opposition, the Debtors submitted the Declaration of George C. Koutouras, in which Mr. Koutouras provided his opinion that the Tax Reorganization had no adverse economic or pecuniary effect on the Debtors. In his deposition however, Mr. Koutouras conceded that his analysis had presumed the solvency of the Debtors and also conceded that the Debtors (whoever they are owned by) could benefit from a high basis in assets. Deposition of George C. Koutouras, October 14, 2008 at page 57, lines 11-22 (the "Koutouras Deposition", a copy of which is attached as <u>Exhibit D</u> hereto); <u>see also</u> Koutouras Deposition at page 96, lines 10-22 and page 105, lines 3-19. Moreover, Mr. Koutouras's testimony reveals that he does not purport to be an expert in bankruptcy valuations and indeed has worked for Alavrez and Marsal for only two weeks. Koutouras Declaration at page 24, lines 9-11 and page 28, lines 6-12.

**The Debtors' Senior Managers Acknowledge That They
Failed to Consider Other Alternatives By Which the
Debtors Could Use the Built in Loss**

15.     As demonstrated above, there were indeed scenarios under which the Debtors could have made use of the Built in Loss (i.e., scenarios that would have preserved the Built in Loss for the reorganized debtors, rather than handing them freely to the existing Equity Holders). Unfortunately, blinded by conflicted self interest, and despite ongoing bankruptcy planning, the Debtors failed to consider these options. The deposition testimony of Leonard Arave is telling:

> Q. What different alternative scenarios, other than the [Tax Reorganization], did Woodside Group consider for making use of the debtor's high basis in its assets?
>
> A. I don't know that we considered any other use for the high basis in our assets.
>
> Q. Do you understand there to be scenarios by which a restructure of Woodside through a bankruptcy process could make use of the high basis in their assets?
>
> A. I don't know of any way, no.

Arave Deposition at page 115, lines 4-15; *see also* Nilson Deposition at page 94, lines 20-25 and page 95, lines 1-3.

16.     Alone, this sort of uninformed decision making would be troubling and might warrant the appointment of a trustee. Here, however, the circumstances are much worse. Despite being starkly uninformed as to the *Debtors*' potential uses of the Built in Loss, the Debtors' managers considered carefully the mechanisms by which the *Equity Holders* could take advantage of the same. Conveniently, the options studied and ultimately implemented by the senior managers ran directly to their own personal benefit. In fact, in prior years, the concept of a corporate reorganization had been brushed aside by the Debtors when such a reorganization

would not have been immensely profitable to the Equity Holders.[18] This type of conflicted, self interested behavior provides precisely the grounds upon which a chapter 11 trustee should be appointed.[19]

## B.  The Debtors Were Harmed by the Zions Related Transfers

17.    As more fully set forth in the Trustee Motion, the Zions related transfers break into two categories: (i) a prepetition transfer of assets from certain Debtors to the Zions Borrowers, and (ii) a grant of liens by the Zions Borrowers to Zions First National Bank. In the view of the Noteholders, both transactions raise questions regarding the judgment of the Debtors' senior managers.

### The Grant of Liens to Zions Bank Raises Questions Regarding the Debtors' Judgment

18.    The Noteholders' arguments in respect of the Zions liens are stated concisely and cogently in the Trustee Motion. They need not be repeated here. The Noteholders are compelled, however, to respond to the following statement from the Opposition and the corresponding declaration of Mr. Arave:

---

[18]  Arave Deposition at 123, lines 23-25 and page 124, lines 1-11.

[19]  As more fully set forth in the Trustee Motion, the law supports an appointment of a trustee (as well as the alternative relief requested by the Noteholders) under these circumstances. In an attempt to counter the Trustee Motion, the Debtors cite a variety of law which is simply not applicable to the cases at hand. They argue that past conduct alone is insufficient to warrant appointment of a trustee. But they can offer no assurance that the history of self interested and covert dealings engaged in by the existing managers will cease in these cases. They cite cases for the proposition that mere acrimony is not sufficient to warrant appointment of a trustee. But they fail to acknowledge that the acrimony in these cases is itself a product of the underlying problem -- a fundamental mistrust of management based on a history of self dealing transactions. They argue that a trustee is unnecessary because the creditors can take all appropriate actions themselves. Unfortunately, no party other than a trustee can replace a conflicted management team -- the Noteholders cannot therefore take all appropriate and necessary actions in these cases. They argue that the estates will be burdened by the appointment of a trustee. But they forget that the Noteholders are the single largest creditor constituency in these cases, with the most to lose from any negative outcome. In fact, the Trustee Motion is supported by the Bank Lenders as well. The Noteholders and Bank Lenders have weighed carefully the benefits of starting anew with an independent third party and determined this the best course forward. This should be very telling as to what is in the best interests of the Debtors' estates.

> The Noteholder Group attacks the grant of collateral to Zions in exchange for the standstill agreement, particularly since the Debtors did not offer them the same deal. There is a difference, however. *Zions had a contractual provision* enabling them to get security upon a default, and the Noteholder Group did not.

Opposition at page 16 (emphasis added).

19. The audacity of this statement is unfathomable. What is about this particular Zions' contract provision that is sacrosanct? Contractual obligations to pay principal to the Noteholders are apparently ok to freely ignore. Contractual obligations to pay interest to the Noteholders are apparently ok to freely ignore. Contractual obligations to comply with financial covenants to the Noteholders are apparently ok to freely ignore. And, worst of all, contractual obligations that block corporate reorganization efforts (i.e., the Tax Reorganization) are apparently ok to freely ignore.

20. Moreover, the Debtors have proven their willingness to consider bankruptcy filings when faced with difficult restructuring situations.[20] Why do the Debtors apply a different analysis in the context of the Zions Borrowers? As it turns out, the answers may rest not with Zions, but, again, with the senior managers' conflicted self interest. Upon information and belief, it appears that the Equity Holders believe there is room to complete a consensual restructuring whereby the Equity Holders jettison their interests in the Debtors and preserve for themselves all equity value in the Zions Borrowers and the Unrestricted Subsidiaries.[21] How

---

[20] The Court can take judicial notice of the Debtors March filing of two voluntary petitions. *See also* Arave Deposition at page 90, lines 9-25; page 91, lines 1-15 and page 108, lines 15-20.

[21] Mr. Arave's deposition testimony indicates as follows:

> Q. What was the proposal that the companies made in August to the banks and the noteholders?
> A. That we would turn the assets over to them in exchange for the debt, that we would run the assets however they want. If they want to go ahead and liquidate them in this market, then we would do that for either a fee, or if they wanted to have a long-term operation, we would do that on an incentive type of basis.

Arave Deposition at page 120, lines 12-20. In actuality, the proposal was more favorable to the Equity Holders

better to ensure a clean and speedy get-away than to ensure that the Unrestricted Subsidiaries are not tied up in a bankruptcy proceedings -- even if it requires the granting of preferential liens to avoid an involuntary filing?  Absent the appointment of a trustee, the Noteholders can only hope the Debtors view the running of applicable preference periods as the outside date to complete such a consensual restructuring (i.e., hope that the Debtors intend to cause the Unrestricted Subsidiaries to file bankruptcy petitions before the preference periods applicable to the Zions liens expire).

**The Transfer of Assets From the Debtors to the Zions Borrowers, Likewise, Raises Questionable Judgment**

21.    Again, the arguments in respect of these transfers are set forth in the Trustee Motion and need not be repeated here.  In short, however, whatever true-up rationales may have existed behind the transfers, they were made on the eve of potential bankruptcy filings.  As more fully set forth in the Trustee Motion, this simply raises concern regarding the Debtors' judgment in operating their businesses.  Alone, the transactions would be troubling, but in the broader context of the conflicted behavior involved in these cases, the transfers warrant close scrutiny and provide yet another basis upon which to grant the relief requested in the Trustee Motion.

C.    **Correcting Certain Factual Mischaracterizations Set Forth in the Opposition**

22.    For the reasons set forth above -- i.e., the managers' self interested transactions, their questionable judgment, and the corresponding harm to the Debtors' estates -- the relief requested in the Trustee Motion should be granted.  This is true regardless of the Oppositions'

---

than the above would suggest. We will refrain from submitting further details at this time, but reserve the right to do so at trial, where counsel will have the opportunity to assert any privileges if applicable.  In short, however, the above testimony highlights that the proposal involved a walk-away from Restricted assets by the Equity Holders, which, by implication, leaves open a possible retention of Unrestricted assets by the Equity Holders. We note that any proposal by which the Equity Holders retain value in the Unrestricted Subsidiaries would ignore the fact that (i) the Equity Holders' interests in the Unrestricted Subsidiaries flow through Woodside Group, and (ii) the Equity Holders' interests in Woodside Group currently rank behind the creditors of Woodside Group.

mischaracterizations of the facts that led to the filing of these bankruptcy cases. That said, in an abundance of caution and in addition to the clarifications provided above, the Noteholders will correct the record on one key theme central to the Opposition.[22]

23.  The Opposition asserts that "the Noteholder Group and the Bank Group were perfectly aware that a transaction such as [the Tax Reorganization], or a functionally similar transaction, would be undertaken." This theme is echoed throughout the Opposition. It is, unfortunately, an absurd mischaracterization. The Noteholders had no knowledge of the intended Tax Reorganization nor did they anticipate that the Debtors might pursue such a course.

24.  To be clear, the Noteholders understood the following: (i) the Debtors recognized significant income in 2006 and 2007, (ii) the Debtors, as a result of ordinary asset sales, were likely to recognize losses -- potentially significant losses -- in 2008, and (iii) due to the pass through nature of the organization and the two year carry back rules, the Equity Holders were likely to seek to use those losses (i.e., the losses generated from asset sales) for purposes of seeking tax refunds.

25.  Quite frankly, during the restructuring discussions, the Noteholders were concerned that the Debtors' senior managers were faced with an unavoidable conflict of interest in running the Debtors' businesses -- that is, sales of assets at less than full value had the potential to trigger tax benefits for the Equity Holders. Originally, the concern wasn't that the Debtors' managers were bad people, but simply that they were faced with a difficult conflict of

---

[22] In fairness to Debtors' counsel, during the prepetition restructuring process, the Noteholders were often concerned with the Debtors' insufficient use of their restructuring lawyers. It is not surprising then that counsel, late to the game, appears unaware of key factual background to these cases. In fact, the Opposition reveals counsel's lack of familiarity with even the day-to-day administrative matters of the case. For instance, the Opposition often refers to FTI Consulting as the Bank Lenders' financial advisor (when they are an advisor to the Noteholders). At one point, the Opposition criticizes the Noteholders' description of the Zions transactions as covert due to counsel's assertion that at least two Noteholders (Bank of America and Key Bank) must have known of the transaction through their participation in the Zions loans. Bank of America and Key Bank are, in actuality, Bank Lenders.

interest. That view, of course, morphed over time.

26. In short, the Noteholders' focus was always on <u>asset sales</u> as a means of generating tax losses. Never in their wildest dreams did the Noteholders or their advisors imagine a circumstance by which the Debtors would create a paper transaction[23] to accelerate all losses without the need for asset sales.[24] And, never in their wildest nightmares did the Noteholders imagine that the Debtors would pursue such a strategy covertly, and in contravention of the Note Agreements.

27. Make no mistake. The Tax Reorganization was pursued covertly -- without disclosure to the Noteholders and, in fact, without disclosure to the Debtors' own restructuring professionals. The deposition testimony highlights this fact:

> Q. When was the corporate tax reorganization first disclosed to the noteholders?
>
> A. After the fact.
>
> Q. Same answer for the bank lenders?
>
> A. Yes.

Nilson Deposition at page 46, lines 3-7.

> Q. Do you recall whether the corporate tax reorganization was disclosed in advance to Alvarez and Marsal [the Debtors' own restructuring advisor]?
>
> A. Are we talking -- just a point of clarification. That we were moving ahead with or that we were considering it?
>
> Q. Both

---

[23] As it turns out, the deposition testimony reveals that the Debtors have a history of completing questionable paper transactions. In particular, Mr. Arave's testimony indicates a transaction in 2008 by which the Debtors transferred certain property to Mr. Nilson's son-in-law for a nominal sum in order to avoid certain reporting obligations to the Bureau of Reclamation Compliance. Arave Deposition at pages 40-42.

[24] In fact, there was no reason for the Noteholders to anticipate the Tax Reorganization, as the concept of the reorganization is somewhat aggressive from a tax point of view in that it seeks to recognize losses in "form" even though the underlying economic losses have not been recognized in "substance." The Noteholders eagerly await the IRS's review of the transaction in connection with the Equity Holders' claims for refunds.

      A. We discussed that we were considering it. I don't know that we notified them that it had taken place.

Arave Deposition at page 59, lines 19-25 and page 60, lines 1-3. In fact, the deposition testimony reveals that the Debtors expressly considered whether to inform the Noteholders and the Bank Lenders of the Tax Reorganization, and determined that notice would not be given. Nilson Deposition at pages 47-48.

    28.    Quite simply, the Tax Reorganization was not only detrimental to the Debtors and their constituents, but it was pursued on an intentionally covert basis for purposes on ensuring the maximum likelihood of consummation and a corresponding boon for the Equity Holders. This type of behavior, as more fully set forth in the Trustee Motion, has served to erode creditor confidence and dictates the granting of the relief requested in the Trustee Motion.

### III.  Conclusion

**WHEREFORE**, the Noteholders respectfully request the entry of an Order directing the appointment of a chapter 11 trustee pursuant to Sections 105 and 1104 of the Bankruptcy Code, or, alternatively, directing both (i) the appointment of an examiner for the limited purposes of investigating certain self interested transactions pursuant to Sections 105 and 1104 of the Bankruptcy Code and (ii) the termination of the Debtors' exclusive periods in which to file and confirm a plan of reorganization pursuant to Section 1121 of the Bankruptcy Code.

DATED:  October 16, 2008

BINGHAM McCUTCHEN LLP

By:    /s/ Jonathan B. Alter
        Michael J. Reilly (Admitted Pro Hac Vice)
        Jonathan B. Alter (Admitted Pro Hac Vice)
        Mark W. Deveno (Admitted Pro Hac Vice)

Counsel to Ad Hoc Group of Noteholders